IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RAY SCOTT FUSS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| | : | 1:22-cv-64-AT |
| v. | : | |
| | : | |
| FREDERICK M. BENSCH, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## **OPINION & ORDER**

This matter begins with a handshake deal between a young artist, Scott Fuss, and a young brewer, Frederick Bensch; it ends with a $366 million acquisition of Bensch's brewing company decades later. In 1996, Plaintiff Scott Fuss, an artist and designer, was introduced to Defendant Frederick Bensch and his business partners, who were in the process of establishing Sweetwater Brewing Company. For $500 and a promise of free beer, Fuss designed a logo for Bensch and his new brewery — a rainbow trout that would become an iconic piece of Atlanta art. The logo design would swim across Sweetwater beer cans for decades, as the company became a top craft brewery and expanded its reach far past Atlanta. Fuss's design work became a seminal emblem in Sweetwater's marketing. But Fuss, Bensch, and Sweetwater never executed a written contract as to the ownership or licensing rights over the logo and associated artwork.

Twenty-four years after that first meeting, Sweetwater was sold to Aphria for $366 million. The sale did not escape Fuss's notice. When he reached out to Bensch about the transfer of his artwork in the Aphria deal — a transaction that valued Sweetwater's intellectual property at $92 million — Fuss was swiftly rebuffed. Fuss brought suit alleging, at bottom, that the continuing use of the artwork after the Aphria acquisition violated the terms of the parties' handshake deal and long-term business relationship. From that core allegation flows complicated questions of contract interpretation, vicarious and contributory copyright infringement, derivative works, fraud, and more. Both parties have provided robust records in support of their respective positions. But in a case so centrally rooted in the conflicting testimony of two parties to an unwritten agreement, credibility is king. For that reason and the additional reasons explained further below, the Court largely denies Defendants' Motions for Summary Judgment.

## I.    BACKGROUND[1]

### A. Creation and Licensing of Artwork

Plaintiff Scott Fuss is an artist who, beginning in 1996, operated a solo art and graphic design firm, Petroglyph Studios. (Deposition of Scott Fuss ("Fuss

---

[1] When deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion (here, Plaintiff). *See, e.g.*, *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007). Bearing that in mind, the Court provides the following statement of facts to place the Court's legal analysis in the context of this case. This factual description does not represent actual findings of fact. *In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).

Depo."), Doc. 215 at 14). Also in 1996, Defendant Frederick ("Freddy") Bensch, along with Matt Patterson, Michael Sloan, and Kevin McNerney, started the Sweetwater Brewing Company ("Sweetwater")[2]. (Bensch Defs.' SMF, Doc. 217-2 ¶ 1). In the fall of that year, a co-worker of Fuss's introduced him to Patterson, who indicated that the fledgling brewery was looking for an artist to design branding materials. (Fuss Depo., Doc. 215 34:8–36:2).

The barebones of this story are undisputed: Sweetwater commissioned Fuss to design its logo, which he did in exchange for $500 and free beer. In early November 1996, Fuss first met with Bensch, Patterson, and Sloan to discuss the possibility of his designing branding artwork for Sweetwater. (Bensch Defs.' SMF 217-2 ¶¶ 15–16; Pl.'s SMF, Doc 237-64 ¶ 1). The parties agree that, at the first meeting, Bensch, Sloan, and Patterson reviewed Fuss's portfolio and asked Fuss to illustrate a logo for Sweetwater. (Bensch Defs.' SMF, Doc. 217-2 ¶ 17).

But from there, the factual fissures that dominate this case begin to emerge. Fuss testified that two meetings occurred between the parties: one in which he was commissioned to draw the logo and was paid $500, and a second in which he delivered the final artwork with no proposed edits. (Fuss Depo., 42:23–43:15; Pl.'s SMF, Doc. 241-47 ¶ 3). The Defendants assert that three meetings between the parties occurred: one at which Fuss was commissioned to draw the logo, the second at which the Sweetwater partners provided feedback on Fuss's drawing, and the

---

[2] As discussed below, Sweetwater and its corporate affiliates are also Defendants in this matter. *See infra* at 18–19.

third in which Fuss presented the drawings in final form and was paid $500. (Deposition of Frederick Bensch ("Bensch Depo."), Doc. 216 86:7–124:12). At either the second or third meeting, Sweetwater asked Fuss to also sculpt a trout-shaped tap handle for the brewery, which Fuss agreed to do. (Bensch Defs.' SMF, Doc. 217-2 ¶ 20).

As a result of those 1996 meetings, Fuss drew two pieces of art for Sweetwater, collectively referred to as the "Artwork": first, the "Trout Banner," which depicts the iconic Sweetwater rainbow trout behind a scrolled banner and, second, the "Fishing Scene," which foregrounds the leaping rainbow trout and depicts two fishermen in the background.




(Trout Banner, Ex. 3 to 3AC, Doc. 260-3 at 2; Fishing Scene, Ex. 2 to 3AC, Doc.260-2 at 2). The parties dispute who first proposed the fish. According to Plaintiff, Sweetwater "indicated [] they wanted to portray in their logo an outdoor lifestyle."

(Pl.'s SMF, Doc. 237-64 ¶ 3). Bensch, however, testified that he and his co-founders "decided that the fish was going to be our center point. . . . We needed to have the rainbow trout be the main focal point." (Bensch Depo., Doc. 216 93:13–16).

After meeting with the Sweetwater partners and delivering the Artwork, Fuss delivered an invoice to Sweetwater dated January 27, 1996 (an error — it should have said 1997). (Pl.'s SMF, Doc. 237-64 ¶¶ 13–14). The invoice read: "Concept, design and illustrate: Sweetwater Brewing Company logo (color and black & white versions)[;] Sweetwater Bottle logo[;] Sculpt dimensional 'Leaping Trout' tap handle," and was paid as agreed.

Scott Fuss
Petroglyph Studio
477 Womack Road
Covington, Georgia 30209
770•786•3541

Date of Invoice:
1-27-96

Invoice to:
Matt Patterson
Sweetwater Brewing Company
900 Wendell Court
Atlanta, GA 30336

Description:
Concept , design and illustrate:
Sweetwater Brewing Company Logo (color and black & white versions)     $500.00
Sweetwater Bottle Logo
Sculpt dimensional "Leaping Trout" tap handle

Sub. $500.00

Ttl. $500.00

(Artwork Invoice, Ex. 5 to Fuss Depo., Doc. 217-7). It is undisputed that Fuss kept the original versions of his drawings and delivered digitized versions to Sweetwater. (Pl.'s SMF, Doc. 237-64 ¶ 12; Bensch Defs.' SMF, Doc. 217-2 ¶ 23 (citing Fuss Interrog. No. 4)). The parties also agree that Fuss created the Artwork in his studio, using his materials, and at his own expense. (3AC, Doc. 174 ¶ 42). At no point was Fuss an employee of Sweetwater. (Pl.'s SMF, Doc. 237-64 ¶¶ 71–72). And similarly, no evidence was presented suggesting Fuss was an associate of Sweetwater, subject to agreed, specified contract terms.

Most crucially, the parties dispute what was agreed to at their two, or three, meetings in 1996. Bensch testified: "I bought the logo, and I bought the fish tap handle and I bought the fishing scene." (Bensch Depo, Doc. 216 16:8–10).[3] Defendants further assert that "none of the founders discussed with Plaintiff any limits on [Sweetwater's] use rights for the artwork at any time prior to this lawsuit." (Bensch Defs.' SMF, Doc. 217-2 ¶ 26 (citing Bensch Depo., Doc. 216 113:1–5; Declaration of Matt Patterson ("Patterson Decl."), Doc. 217-19 ¶¶ 32, 36)). Plaintiff's recollection is far different: "Fuss proposed that for the $500 already given [Sweetwater] could use [the Artwork] *as long as* (a) Bensch owned [Sweetwater] . . . and (b) [Sweetwater] acknowledged Fuss as the owner of the copyrights." (Pl.'s SMF, Doc. 237-64 ¶ 9 (citing Fuss Interrog. No. 4) (emphasis in original)). This is the factual dispute at the heart of the case.

---

[3] At this juncture in the litigation, the Defendants' position has shifted from the idea that Sweetwater *owns* the Artwork to the idea that Sweetwater has an unconditional license. (*See generally* Bensch Defs.' MSJ, Doc. 217-1).

### B. Growth of Sweetwater

### i.  2002 Litigation & 2003 Assignment

Over the next 25 years, Sweetwater grew to become a successful craft brewery. And over those decades, Fuss and Bensch stayed in contact. Though the agreement between Fuss and Sweetwater was never memorialized in writing past the invoice described above, two subsequent writings between the parties are relevant to this matter.

On June 5, 2002, Sweetwater filed a trademark infringement lawsuit in Virginia against a restaurant using its trademarks, "Sweetwater Tavern" and "Sweetwater Light," to sell beer and other products. *See SweetWater Brewing Co., LLC v. Great American Restaurants, Inc.*, 266 F. Supp. 2d. 457 (E.D. Va. 2003). (Pl.'s SMF, Doc. 237-64 ¶ 24). In October 2002, Bensch asked Fuss if Sweetwater could take temporary physical possession of the original Artwork drawings to help prove Sweetwater's trademark rights. (*Id.* ¶¶ 25–26). Plaintiff agreed but drafted an agreement specifying the drawings to be loaned and the attendant conditions, the "2002 Agreement." (2002 Agreement, Ex. 6 to Fuss Depo., Doc. 217-8). The 2002 Agreement, which was signed by both Bensch and Fuss and notarized, reads in relevant part:

> I, Frederick Bensch, acknowledge receipt of the following items which are **the copywritten materials and the property of Ray Scott Fuss** and/or Scott Fuss doing business as Petroglyph Studio.

> I agree to return the following materials to Ray Scott Fuss on or no later than the mutually agreed upon date of Dec [sic] 2002.

(*Id.* at 2 (emphasis added)).

Also in connection with the Virginia trademark litigation, Bensch executed a declaration in support of Sweetwater's motion for summary judgment. (Pl.'s SMF, Doc. 237-64 ¶¶ 28–33). Both pieces of Artwork were exhibits to the declaration, and each prominently shows Fuss's signature and handwritten copyright notice dated 1996. (*Id.* ¶¶ 31–34; *see also* Bensch Declaration, Ex. 6 to 3AC, Doc. 262-2 at 46–47). Sweetwater ultimately won a permanent injunction and damages in that litigation, *SweetWater v. Great Am. Restaurants*, 266 F. Supp. 2d at 465, and timely returned the Artwork to Fuss.

In 2003, the parties crossed paths again when Bensch approached Fuss to request a transfer and assignment of all rights associated with the trout tap handle that Fuss had designed for the company.[4] (Pl.'s SMF, Doc. 237-64, ¶¶ 36–43; 2003 Assignment, Ex. X to Damages MSJ, Doc 210-26). That agreement, which again was signed by both Fuss and Sweetwater, reads in relevant part:

> Whereas, Assignor [Fuss] was retained by Assignee [Sweetwater Brewing Company, LLC] to author a three-dimensional visual work comprising a representation of a trout, photographs of which are attached hereto, including, but not limited to all two-dimensional representations thereof (collectively, the "Work"); and
>
> Whereas, Assignee is desirous of acquiring the entire right, title, and interest in and to the Work in any and all forms of media now known or which may hereinafter become known.

(2003 Assignment, Ex. X to Damages MSJ, Doc 210-26 at 2). The assignment

---

[4] This request belies the notion that Bensch "bought the logo, and [] the fish tap handle and [] the fishing scene" at the parties' original meetings in 1996. (Deposition of Frederick Bensch ("Bensch Depo."), Doc. 216 16:8–10).

further stated that

> for good and valuable consideration . . . Assignor hereby sells, assigns, transfers to Assignee, its successors and assigns, the entire right, title, and interest in and to the Work [including] all worldwide copyrights[;] all other intellectual property associated with the Work[;] all rights of action against third parties Assignor had, has, or may have; together with the exclusive, unlimited, and perpetual right throughout the world to secure statutory copyrights and renewals, reissues, and extensions of such copyrights[.][5]

It does not appear that Fuss actually received additional consideration for this assignment. (Pl.'s SMF, Doc. 237-64 ¶ 42; Defs.' Damages SMF, Doc 210-29 ¶ 51).

### ii.    Fuss's Copyright Registrations

In 2017 and 2018, respectively, Mr. Fuss applied for and received federal copyright registrations for the Fishing Scene and the Trout Banner. (3AC, Doc. 174 ¶ 98). The Fishing Scene's effective date of registration was September 26, 2017; it was assigned registration number VA0002084616. (*Id.*; *see also* Fishing Scene Copyright Reg., Ex. 8 to 3AC, Doc. 260-8). The Trout Banner's effective date of registration was March 7, 2018; it was assigned registration number VAu001326605. (3AC, Doc. 174 ¶ 98; *see also* Trout Banner Copyright Reg., Ex. 9 to 3AC, Doc. 260-9).

### iii.    2018 Sale Offer

On March 27, 2018, amid an unrelated conversation, Fuss wrote to Bensch: "I've been evaluating the liquidation of some of my intellectual properties,

---

[5] The assignment encompassed *only* the three-dimensional sculpted trout handle, and no party disputes as such. In deposition testimony, Bensch indicated that Sweetwater requested the tap handle assignment because a manufacturer sought explicit proof of ownership. (Bensch Depo., Doc. 216 197:2–201:7).

SweetWater collateral being among them. Contact me when you have a chance. I'd like to see if you are interested in purchasing copyrights and original works: Banner art, Logotype, Label art, concept sketches etc." (March 2018 Emails, Ex. 15 to Fuss Depo., Doc. 217-10 at 2). Fuss testified in his deposition that, in a call following that email, he and Bensch discussed his offer of sale:

> I just made him aware that I was putting the offer out there to sell, and I said, look, you don't have to do anything right now, but, **you know, whenever you sell the brewery, you need to square up on the intellectual properties**, and he said okay. We were both okay.

(Fuss Depo., Doc. 215 172:16–19 (emphasis added)). Bensch does not necessarily dispute the contents of that call, though his impression was certainly different than Fuss's, as Bensch testified in his deposition:

> I was surprised that Scott was reaching out and wanted to sell his original artworks, and then he's bringing up trying to sell the copyrights, which sounded kind of fishy to me because we had already bought those and paid for everything back in 1996. And now, after 20 years, he's bringing that up. And I was pretty confused by the inbound.

(Bensch Depo., Doc. 216 304:8–15). The record does not reflect other offers of sale between 1996 and the events leading up to this litigation.

### C. Events Leading to the Instant Suit

### i. Aphria Merger and Acquisition

In 2019, Sweetwater was in acquisition negotiations with Canadian cannabis company Aphria, Inc. (3AC, Doc. 174 ¶ 26). The negotiations resulted in Aphria's acquisition of Sweetwater in late 2020, which was publicly announced on

November 4, 2020. (*Id.* ¶¶ 100–103; Bensch Defs.' SMF, Doc. 217-2 ¶ 51).[6] The

acquisition was valued at $366 million, with $92 million of that price allocated to

Sweetwater's intellectual property assets. (3AC, Doc. 174 ¶ 103).

As part of the formal merger and acquisition, Sweetwater was required to

disclose its intellectual property holdings. Specifically, Section 3.8 of the

Agreement of Merger and Acquisition reads in relevant part:

(a)    Set forth on Section 3.8(a) of the Disclosure Letter is a complete and accurate list of all Company Intellectual Property that is (i) Registered Intellectual Property as of the date hereof and that has not otherwise lapsed, been abandoned, expired, or been canceled . . . that are material to the conduct of the Businesses of the Company and any of its Subsidiaries. Each item of Company Registered Intellectual Property is valid and enforceable, and each item of Company Registered Intellectual Property is subsisting. No loss or expiration of any Company Owned Intellectual Property is threatened in writing, pending, or reasonably foreseeable.

(b)    Except as set forth on Section 3.8(b) of the Disclosure Letter, the Company and its Subsidiaries **collectively own or have the rights to use, pursuant to a written, enforceable license agreement, all Intellectual Property Rights that are reasonably necessary for or material to the conduct of the businesses** of the Company and any of its Subsidiaries. . . .

(e)    Except as set forth on Section 3.8(e) of the Disclosure Letter, the Company or one of its Subsidiaries has secured from each employee, contractor or other Person who is or was involved in the creation or development of any Company Intellectual Property, **a written agreement containing (A) a present, affirmative assignment of all Intellectual Property developed by such employee, contractor, or Person rights in such Company Intellectual Property** for on behalf of, or during their employment by the Company or any

---

[6] In 2021, Aphria completed a merger with Tilray, Inc., which is now Sweetwater's parent company. (3AC, Doc. 174 ¶ 8).

11

of its Subsidiaries . . . .

(Aphria M&A Agreement, Ex. 1 to 3AC, Doc. 261-1 at 28–29 (emphasis added)). The referenced Disclosure Letter does not reflect Sweetwater's license in the Artwork, nor does it reflect Fuss's ownership of the Artwork. The Disclosure Letter also does not indicate that Sweetwater itself owns or owned the copyright interest in the Artwork.

### ii. Trustee Interest[7]

At the time of the Aphria transaction, two trusts — Defendants No Quarter Trust and Tortoise Trust — owned a significant amount of Sweetwater stock. (Pl.'s Resp. to Trustee Defs.' MSJ, Doc. 241 at 4–5). As such, the acquisition was effectuated in part by the sale of those two trusts' stock to Aphria. (*Id*. at 5).[8] As part of that transaction, the Trustees signed the Written Consent of the Members of SW Brewing Company, LLC in Lieu of Special Meeting, which stated, in relevant part, that the Trustees had "reviewed the Acquisition Agreement and the other Transaction Documents, and [] determined that it is advisable for the Company to enter into, execute, deliver and perform its obligations under the Acquisition Agreement[.]" (Trustee Defs.' SMF, Doc. 218-2 ¶¶ 8–9). After approving the

---

[7] The Court notes that much of the parties' discussion as to the Trustees and their liability is heavily redacted and thus takes care regarding its analysis of confidential information. However, the Court also takes notice of the parties' discussion of the Trustees and their possible liability in open court at the hearing on the instant motions. (*See generally* MSJ Hearing Tr., Doc. 268 84:13–134:8).

[8] The Trustees of No Quarter Trust are Sharon Bensch, Ian Easton, and Hampton Mallis; the Trustee of Tortoise Trust is a corporate entity, Wood Duck, LLC. (Trustee Defs.' MSJ, Doc. 218-2). Both trusts, by way of their Trustees, are Defendants in the instant litigation.

Acquisition Agreement, the Trustees appointed Chilly Water, LLC (Bensch's corporate entity) to represent them "in connection with the Merger and the transactions contemplated by the Acquisition Agreement." (*Id.* ¶ 10 (citing Aphria M&A Agreement, Ex. 1 to 3AC, Doc. 261-1 at 65–66)). That appointment granted to Chilly Water

> full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection with the transactions contemplated by the Acquisition Agreement . . . [and] to bind each such person in accordance with the Acquisition Agreement and the other Transaction Documents, and to consummate the Merger.

(*Id.* ¶ 11). In short, as the agent of Chilly Water, Bensch executed the Aphria merger agreement on behalf of the Trustees.

### iii.    Fuss Asserts Copyright Interest

On November 9, 2020 — a few days after the public announcement of the Aphria transaction — Fuss texted Bensch: "Congratulations on the sale of Sweetwater Brewing Co. to Aphira [sic]. That's big news! Along those lines, when you have a chance, give me a shout to discuss my holdings of original artwork and the associated copyrights. Thanks! Scott[.]" (Fuss/Bensch Text Messages, Ex. C to Damages MSJ, Doc. 210-5). On November 10, Bensch responded: "Hi Scott- appreciate that. Ok if I get back to you on this after Thanksgiving [sic]. Beyond buried at this point as I'm sure you can image [sic]. Best[.]" (*Id.*). They agreed to talk on December 2. (*Id.*)

On November 12, 2020, days after this text exchange, Sweetwater attorney Stephen Schaetzel filed an expedited application to register the Trout Banner with

the U.S. Copyright Office. (Pl.'s SMF, Doc. 237-64 ¶ 69; Sweetwater Registration, Ex. 12 to Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237-13 at 2). Record evidence shows Bensch's involvement in this application process. Specifically, when the Copyright Office followed up with Sweetwater's attorney seeking a color version of the Trout Banner, Bensch helped move this process along. (Email Between Copyright Office & Sweetwater, Ex. 12 to Pl.'s Resp to Bensch Defs.' MSJ, Doc. 237-13 at 8, 10; Email Between Bensch & Thoren, Ex. 15 to Pl.'s Resp to Bensch Defs.' MSJ, Doc. 237-16 at 2). In its copyright application, Sweetwater indicated the Trout Banner was a "work for hire," i.e. created by an employee within the scope of their employment.[9] (Sweetwater Registration, Ex. 12 to Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237-13 at 3). On November 25, 2020 — the day before Thanksgiving — Sweetwater's expedited registration was approved by the Copyright Office. (*Id.* at 16). Also on November 25, the Aphria transaction formally closed. (Pl.'s SMF, Doc. 237-64 ¶ 76; Bensch Defs.' SMF, Doc. 217-2 ¶ 46).

On December 2, 2020, Fuss and Bensch spoke via telephone. (Pl.'s SMF, Doc. 237-64 ¶¶ 62–63, 78–79; Bensch Defs.' SMF, Doc. 217-2 ¶ 54). According to Fuss's deposition testimony as to the call, he indicated to Bensch that

> we need to talk about the squaring up on the intellectual properties, the logos, and all the things associated with the Sweetwater intellectual properties, and then he said, I own that shit. . . . I own the copyrights and so forth, and he said, I'm the fisherman in the fucking boat or I'm – something to that effect.

(Fuss Depo., Doc. 215 279:19–280:5). Bensch, meanwhile, testified that "for the

---

[9] 17 U.S.C. § 101.

first time, shockingly enough, Scott was claiming that we owed him more money for the drawings that we had paid him for back in 1996. . . . He said, 'Now that you sold your brewery, you gotta pay me money.'" (Bensch Depo., Doc. 216 291:16–293:14). The December 2nd conversation ended, unsurprisingly, without resolution of the dispute.

On December 7, Plaintiff's counsel reached out to Sweetwater's outside counsel, notifying him that Plaintiff authored and owned the Artwork: "Our client owns copyrighted artwork upon which the SweetWater branding was built. This is most certainly a matter that should be addressed prior to any sale of the company. . . . Time is of the essence in this matter, with sale pending for SweetWater Brewing." (December 2020 Hoots Emails, Ex. 12 to 3AC, Doc. 260-12 at 2). On December 24, defense counsel responded indicating that "Mr. Fuss was considered and treated as if he were an employee"; that the Artwork was "works for hire"; and that "[a]ccordingly, SweetWater owns the copyright in the subject designs." (December 2020 Schaetzel Letter, Ex. 5 to Plaintiff's Resp. to Bensch Defs.' MSJ, Doc. 237-6 at 3).[10] Defense counsel also asserted that "[b]ecause SweetWater owns the copyright in these designs as works made for hire," Fuss's 2017 and 2018

---

[10] The Court notes that no record evidence reflects that Fuss was, at any time, a Sweetwater employee. At the time of this correspondence, defense counsel relied on the fact that Fuss "drew the SweetWater designs, was paid for his work and proceeded to take full advantage of his employee-like status by accepting beer at the brewery for more than two decades." (December 2020 Schaetzel Letter, Ex. 5 to Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237-6 at 3). But Plaintiff contends that he was not a Sweetwater employee when he created the Artwork because he was not provided wages, employee tax returns, or any employee benefits. (Pl.'s SMF, Doc. 237-64 ¶¶ 71, 72). Defendants no longer appear to argue that Fuss was an employee or that the Artwork constitutes works for hire.

copyright registrations of the Artwork were "invalid." (*Id.*).

On January 19, 2021, Plaintiff's counsel responded, rebutting the work-for-hire assertion and noting that "not only has Mr. Fuss asserted claims of ownership in the works over the years, but your client has affirmatively acknowledged Mr. Fuss's ownership rights." (January 2021 Hoots Letter, Ex. 14 to 3AC, Doc. 260-14 at 2). Plaintiff's counsel also, at that point, indicated that "Mr. Fuss developed and delivered copies of his work product to SweetWater in return for $500 and an understanding with Mr. Bensch that Mr. Fuss **would be compensated more fully if/when SweetWater was sold.**" (*Id.* (emphasis added)). On February 9, 2021, Sweetwater's outside counsel responded, shifting away from the work-for-hire argument and asserting that "Sweetwater enjoys an implied license to use the trout design[.]" (February 2021 Hyland Letter, Ex. 15 to 3AC, Doc. 260-15 at 3).

On May 18, 2021, Plaintiff's counsel wrote to defense counsel with a notification that Fuss intended to terminate Sweetwater's license.

> Mr. Fuss was, is, and remains the author and owner of the Copyrighted Material. Based solely on your client's words, conduct, and actions, which are adversarial to, and flatly contradict, the history of the relationship between the parties and the 2002 Agreement, and further which constitute openly false representations of ownership in the Copyrighted Material to the detriment of Mr. Fuss's rights in same, the agreement between the parties has been breached. Therefore, be advised:
>
> **EFFECTIVE IMMEDIATELY: Mr. Fuss hereby terminates each, every, and all licenses and permissions to use the Copyrighted Material in any way. Be further advised that Mr. Fuss has not sold, assigned, licensed, conveyed or otherwise transferred any right, title, or interest in the Copyrighted Material to Aphria, Tilray or any other assign or successor in interest to Mr. Bensch or SweetWater**

16

**Brewing[.]**

(Termination Letter, Ex. 16 to 3AC, Doc. 260-16 at 4 (emphasis in original)). The next day, Plaintiff's counsel also sent defense counsel a Formal Notice to Cease and Desist. (Cease & Desist, Ex. 17 to 3AC, Doc. 260-17). This litigation soon followed.

### D. Instant Litigation

On September 17, 2021, Plaintiff brough suit in the Superior Court of Fulton County against Bensch and various Sweetwater corporate entities, alleging "intentional conversion, fraud, deceit, concealment, and misrepresentations concerning Mr. Fuss's intellectual property." (State Ct. Compl., Doc. 1-1). Defendants removed the case to this Court in January 2022. (Doc. 1). Plaintiff subsequently twice amended his Complaint, including to modify the corporate Defendants. (Docs. 23; 35). The current Defendants are: Frederick Bensch; Class V, Inc.; Sweetwater Brewing Company, LLC; SW Brewing Company, LLC; SWB Management, LLC; Chilly Water, LLC; Sharon Bensch, as Trustee of No Quarter Trust; Wood Duck, LLC, as Trustee of Tortoise Trust; Cheese Grits, LLC; Aphria, Inc.; Four Twenty Corporation; Sweetwater Colorado Brewing Company, LLC; and Tilray Brands, Inc. (3AC, Doc. 174).

In December 2022, Defendants Bensch, SW Brewing Company, LLC, SweetWater Brewing Company, LLC, Class V, Inc., No Quarter Trust, and Tortoise Trust moved for Judgment on the Pleadings. (Docs. 82; 83). In September 2023, the Court denied those motions in full, finding that, at that juncture, "the Court [was] unable to determine as a matter of law that Defendants' act of consummating

17

the Merger did not constitute a breach of the license agreement between the parties." (Order on MJOP, Doc. 115 at 30). As a result, the Court also could not find that the "Trust Defendants did not authorize infringing conduct by their authorization of the Merger." (*Id.*). This matter then proceeded to discovery.

In the meantime, Sweetwater rebranded. In April 2024, Sweetwater launched its new logo:



(Sweetwater Website, Ex. 19 to Pl.'s Resp. to Damages MSJ, Doc. 232-20 at 2). As a result, and with the leave of Court, Plaintiff filed its Third Amended Complaint, the operative pleading here. (Docs. 135; 174). The Third Amended Complaint includes thirteen counts against the above-listed Defendants:

| Count | Claim | Defendants |
|:---:|:---:|:---:|
| **I** | Fraud | Bensch; SW Brewing Company, LLC; Sweetwater Brewing Company, LLC; Aphria, Inc.; Tilray, Inc. |
| **II** | Fraudulent Concealment | Bensch; SW Brewing Company, LLC; Sweetwater Brewing Company, LLC; Aphria, Inc.; Tilray, Inc. |

| III | Breach of Fiduciary Duty | Bensch; SW Brewing Company, LLC; Sweetwater Brewing Company, LLC; Aphria, Inc.; Tilray, Inc. |
|---|---|---|
| IV | Slander of Title | Bensch; Sweetwater Brewing Company, LLC; Four Twenty Corporation |
| V | Breach of Contract (Express Oral) | Bensch; Class V, Inc.; Sweetwater Brewing Company, LLC |
| VI | Breach of Contract (Implied in Fact) | Bensch; Class V, Inc.; Sweetwater Brewing Company, LLC |
| VII | Declaratory Judgement (Plaintiff is Sole Owner of Copyrighted Material) | All Defendants |
| VIII | Declaratory Judgement (Plaintiff Properly Terminated Any License) | All Defendants |
| IX | Declaratory Judgement (False Registration) | Sweetwater Brewing Company, LLC |
| X | Copyright Infringement (Direct) | Sweetwater Brewing Company, LLC; Sweetwater Colorado Brewing Co., LLC; Cheese Grits, LLC |
| XI | Copyright Infringement (Vicarious) | Tilray Brands, Inc.; Four Twenty Corporation; SW Brewing Company, LLC |
| XII | Copyright Infringement (Vicarious; Bensch as CEO) | SW Brewing Company, LLC; Sweetwater Brewing Company, LLC; Sweetwater Colorado Brewing Co.; LLC; Cheese Grits, LLC; Class V, Inc. |
| XIII | Copyright Infringement (Contributory) | SW Brewing Company, LLC; Chilly Water, LLC; SWB Management, LLC; Trustees for No Quarter Trust; Trustee for The Tortoise Trust |

19

(Doc. 258-1). Discovery in this matter closed in April 2025, and the parties voluntarily proceeded to mediation in May 2025, which did not yield a resolution. (JSR, Doc. 193). On June 20, 2025, Defendants moved for summary judgment.

The Defendants, collectively, have brought three Motions for Summary Judgment. First, Bensch, along with his corporate entities Chilly Water and Class V (the "Bensch Defendants") moved for summary judgment as to Plaintiff's claims of fraud (Count I), fraudulent concealment (Count II), breach of fiduciary duty (Count III), breach of express contract (Count V), breach of implied contract (Count VI), direct copyright infringement (Count X), vicarious copyright infringement (Counts XI, XII), and contributory copyright infringement (Count XIII). The Bensch Defendants also moved for summary judgment as to Plaintiff's claim for a declaratory judgment that he properly terminated the alleged license for the Artwork (Count VIII). (*See generally* Bensch Defs.' MSJ, Doc. 217-1). Second, the trustees of both No Quarter Trust and Tortoise Trust (the "Trustee Defendants") have moved for summary judgment on Plaintiff's contributory copyright infringement claim (Count XIII), the sole claim against them. (*See generally* Trustee Defs.' MSJ, Doc. 218-1). Finally, all Defendants have moved for summary judgment as to the calculation of actual damages on Plaintiffs' infringement, fraud, fraudulent concealment, and breach of fiduciary duty claims. (*See generally* Damages MSJ, Doc. 210-1).[11] Those Motions are fully briefed and

---

[11] No Defendant has moved for summary judgement as to the slander of title claim (Count IV); the claim for a declaratory judgment regarding Plaintiff's ownership (Count VII); or the claim for a declaratory judgment regarding the duplicative registration (Count IX).

ripe for the Court's adjudication. (Damages MSJ, Doc. 210; Pl.'s Resp. to Damages MSJ, Doc. 232; Defs.' Reply ISO Damages MSJ, Doc. 249; Bensch Defs.' MSJ, Doc. 217; Pl.'s Resp to Bensch Defs.' MSJ, Doc. 237; Bensch Defs.' Reply ISO MSJ, Doc. 252; Trustee Defs.' MSJ, Doc. 218; Pl.'s Resp. to Trustee Defs.' MSJ, Doc. 241; Trustee Defs.' Reply ISO MSJ, Doc. 253). The Court also has benefited from oral argument held on these Motions. (MSJ Hearing Tr., Doc. 268).

## II.    LEGAL STANDARD

The Court shall grant summary judgment if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict for the non-movant. *Id.* at 248–49.

When ruling on a Motion for Summary Judgment, the Court must view all evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this

initial burden, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial and survive summary judgment. *Id*. at 324–26. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In evaluating a Motion for Summary Judgment, the Court may consider "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" in the record." Fed. R. Civ. P. 56(c)(1)(A).

### III.    THE LICENSE

The Court now turns to the substance of Defendants' Motions. At the crux of Plaintiff's claims — and, thus, Defendants' Motions — is the license given to Sweetwater in 1996. The question of whether the Bensch Defendants can be held liable for copyright infringement relies on (1) whether a license between Fuss and Sweetwater existed; (2) the scope of that license; and (3) whether and when Fuss effectively revoked that license. Without making conclusions about the scope of the license, the Court cannot adjudicate Plaintiff's direct infringement claim (Count X) or any of the offshoot infringement claims (Counts XI, XII, XIII). The parties agree

that, in 1996, Fuss created the Artwork for the fledgling Sweetwater brewery and licensed the Artwork to Sweetwater. (Bensch Defs.' SMF, Doc. 217-2 ¶¶ 15–26; Pl.'s SMF, Doc 237-64 ¶¶ 1–13). The contours of that license, however, are not clear.[12]

## A. Creation of the License

The Court starts, naturally, at the beginning — the inception of the relationship between Fuss and Sweetwater and the creation of the license. Neither party asserts that a written license was executed in 1996 at the beginning of the Fuss/Sweetwater relationship. The Bensch Defendants contend that Plaintiff granted Sweetwater an "unconditioned, unlimited, irrevocable nonexclusive license in the artwork." (Bensch Defs.' MSJ, Doc. 217-1 at 15). Plaintiff, conversely, argues that "Fuss and [Sweetwater] had an ***express*** agreement that provided a conditional license to [Sweetwater] to use the logo art." (Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237 at 18) (emphasis in original).[13] In Plaintiff's view, this distinction is highly material, because an express license, unlike an implied license, would purportedly allow for the conditions that Plaintiff alleges, which are described in depth below. (MSJ Hearing Tr., Doc. 268 60:4–20). However, implied licenses can

---

[12] Bensch personally appears to represent throughout his deposition and elsewhere that Sweetwater has **owned** copyright to the Artwork since the original transaction in 1996. (Bensch Depo., Doc. 216 16:8–10; December 2020 Schaetzel Letter, Ex. 5 to Plaintiff's Resp. to Bensch Defs.' MSJ, Doc. 237-6 at 3). This contention does not appear to have been adopted by his lawyers at this juncture, nor is it supported by the record. (*See generally* Bensch Defs.' MSJ, Doc. 217-1).

[13] The parties appear to agree that, because it is not in writing, the license must be non-exclusive. *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997) ("In contrast to an exclusive license, a nonexclusive license to use a copyright may be granted orally, or may even be implied from conduct." (cleaned up)).

also be limited in scope, essentially a version of conditionality. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010) ("Implied licenses may be limited and a defendant who exceeds the scope of an implied license commits copyright infringement.").

"Whether express or implied, a license is a contract governed by ordinary principles of state contract law." *McCoy v. Mitsubishi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed. Cir. 1995). "An express contract is one where the intention of the parties and the terms of the agreement are declared or expressed by the parties, in writing or orally, at the time it is entered into." *Classic Restorations, Inc. v. Bean*, 155 Ga. App. 694, 699 (Ga. Ct. App. 1980). Conversely, "[a]n implied contract is one not created or evidenced by distinct and explicit language, but inferred by the law as a matter of reason and justice." *Id.* "There cannot be an express and implied contract for the same thing existing at the same time between the same parties. It is only when the parties themselves do not expressly agree, that the law interposes and raises a promise." *Id.* "[W]here there is a conflict in the evidence as to the existence of an oral contract or as to its terms, the matter must be submitted to a jury for resolution.'" *Rome v. Polyidus Partners LP*, 322 Ga. App. 175, 178 (Ga. Ct. App. 2013) (quoting *Dover v. Mathis,* 549 S.E.2d 541, 542 (Ga. Ct. App. 2001)).

As discussed *supra* at 2–6, the parties disagree about virtually every detail related to the creation of the license. In Defendants' telling, an implied license for Sweetwater's use of the Artwork arose when "Plaintiff delivered the finished products to [Sweetwater], and [Sweetwater] paid Plaintiff the $500 for the

artwork." (Bensch Defs.' SMF, Doc. 217-2 ¶ 20). According to Defendants, "none of the founders discussed with Plaintiff any limits on [Sweetwater's] use rights for the artwork at any time prior to this lawsuit." (*Id.* ¶ 26 (citing Bensch Depo., Doc. 216 113:1–5; Patterson Decl., Doc. 217-19 ¶¶ 32, 36)). Plaintiff testifies that the licensing was much more explicit than that. In his telling, Fuss allowed Sweetwater to use the Artwork for their branding as long as (1) Bensch owned the brewery and (2) the company recognized Fuss as the copyright owner. (Pl.'s SMF, Doc 237-64 ¶¶ 9–10 (citing Fuss Interrog. No. 4)). In other words, the parties fundamentally disagree about how the license was created and, as discussed below, the scope of that license. Such factual disputes about the terms of the license seriously complicate the possibility of summary judgment on Plaintiff's infringement claims.

### B. Scope of the License

Specifically, Plaintiff contends that the license was oral, express, and limited, with two key conditions. In his account of the deal, Fuss allowed Sweetwater to use the Artwork "***as long as*** (a) Bensch owned [Sweetwater] . . . and (b) [Sweetwater] acknowledged Fuss as the owner of the Copyright." (Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237 at 10 (emphasis in original)). Conversely, the Bensch Defendants take the position that the license is implied, unconditional, and irrevocable. Bensch denies that any whiff of Fuss's alleged conditions existed before the instant suit. (Bensch Depo., Doc. 216 16:8–14).

"[W]hen there is no dispute as to the existence of a license, and instead the Parties' dispute is over the scope of an admittedly existent license, 'the copyright

25

owner bears the burden of proving that the defendant's copying was unauthorized,'" i.e., Defendant must "show that Plaintiff cannot sustain its burden of demonstrating that Defendant exceeded that license's scope." *Virtual Studios, Inc. v. Royalty Carpet Mills, Inc.*, 2014 WL 12495340, at *6 (N.D. Ga. Feb. 10, 2014) (Murphy, J.) (quoting *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995)). At the summary judgment stage, however, that burden of proof exists within the framework of construing the facts in the non-movant's (Plaintiff's) favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The dispute over the scope of the license here relates to two alleged conditions subsequent. A condition subsequent is one that, if triggered, "will bring something else to an end." *Black's Law Dictionary* (12th ed. 2024). "The breach of a condition subsequent may destroy the party's rights under the contract or may give a right to damages to the other party, according to a true construction of the intention of the parties." O.C.G.A. § 13-3-4; *see also Jordan Realty Co. v. Chambers Lumber Co.*, 176 Ga. 624 (1933). "[N]o precise technical words are required to create a condition subsequent, and the court will look to the intent of the parties as expressed in the agreement." John K. Larkins, Jr., *Georgia Contracts: Law and Litigation* § 5:5 (citing *Munford, Inc. v. Citizens & Southern Nat'l Bank*, 151 Ga. App. 112 (Ga. Ct. App. 1979); *Jones v. Williams*, 132 Ga. 782 (Ga. 1909)). Nevertheless, "where there is a conflict in the evidence as to the existence of an oral contract or as to its terms, the matter must be submitted to a jury for resolution.'" *Rome*, 322 Ga. App. at 178.

One case arising out of this district is particularly instructive as to how parties establish a license and circumscribe its scope. In *Virtual Studios*, Judge Harold L. Murphy of the Northern District of Georgia held that, in the face of disputed evidence about the duration of a written license, summary judgment was inappropriate. There, the plaintiff, a company that created "digital room scenes," sued a carpet manufacturer for copyright infringement, alleging defendant's continued use of plaintiff's digital images exceeded the scope of the parties' non-exclusive license. *Virtual Studios, Inc.*, 2014 WL 12495340, at *2–5. The plaintiff alleged that the license carried a one-year limitation, which the defendant denied agreeing to. *Id.* at *7. The Court found that "[b]ecause the only evidence [it had] to rely on [was] the competing testimony of the Parties, it must leave resolution [of] the terms of the disputed licensing agreement to the jury." *Id.* "Consequently, while the Court holds, and the Parties do not dispute, that Plaintiff granted Defendant a non-exclusive license to use the Disputed Images, the Court decline[s] to find whether or not such license included a one-year limitation on Defendant's use." *Id.*

In a more recent case, the Southern District of Florida established the conditions of an oral implied license only after its findings at a bench trial. *HH Advert., Inc. v. Unique Vacations, Inc.*, 2025 WL 2027556 (S.D. Fla. July 21, 2025). There, the plaintiff advertising agency provided discounted services to the defendant resort, but retained ownership rights to its photos until the relationship ended, at which point defendant would purchase them. Despite factual ambiguities, the district court's "firsthand observation . . . at [the bench] trial, as

27

well as its review of corroborating evidence" allowed the court to make factual findings as to the license conditions.[14] Eventually, "the Court conclude[d] [that] Defendants had an implied license to use the Works," that the plaintiff had "effectively communicated the temporal restriction before delivering *any* works, and [that] the parties' subsequent conduct confirmed they continued to operate under that original understanding." *Id.* at *16–19. Again, however, these factual findings were made only after the benefit of a bench trial.

### 1. Bensch Ownership of Sweetwater

With the benefit of this legal context, the Court returns to the license at hand. Plaintiff alleges that the license conferred in 1996 included two conditions. First, Sweetwater "was permitted to continue using the Logo Art only so long as Freddy Bensch remained an 'owner'" of the brewery. (Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237 at 7). In deposition testimony, Plaintiff indicated that, when the license was formed in 1996, he made this condition clear: "[T]hey could use [the Artwork] as long as Freddy owned the brewery[.] . . . I stated that." (Fuss Depo., Doc. 215 72:15–18; *see also generally id.* at 70:11–75:19). Bensch's recollection of the 1996 agreement differs entirely: "I bought the logo, and I bought the fish tap handle and

---

[14] The court there found that plaintiff orally licensed the works despite the fact that "in the leadup to a proposed — but ultimately unconsummated — sale of the resort brands," the defendant's CEO "did not discuss Plaintiff's intellectual-property rights with the potential buyer and had no plan to compensate Plaintiff in connection with the sale. . . . Nor did Defendants provide documents to the potential buyer describing a payment agreement or Plaintiff's ownership rights — despite uploading Plaintiff's price list to a data room during the due-diligence process." *HH Advert., Inc. v. Unique Vacations, Inc.*, 2025 WL 2027556, at *5 (S.D. Fla. July 21, 2025). These omissions are strikingly close to Sweetwater and Bensch's own conduct during the merger negotiations with Aphria.

I bought the fishing scene. . . . And everything went with it. There was never any discussion about anything else." (Bensch Depo., Doc. 216 16:8–14).

According to Fuss, the condition regarding Bensch's ownership of the brewery arose again in March 2018, when Fuss wrote to Bensch regarding "the liquidation of some of [his] intellectual properties, SweetWater collateral being among them" and gauging Bensch's "interest[] in purchasing copyrights and original works: Banner art, Logotype, Label art, concept sketches etc." (March 2018 Emails, Ex. 15 to Fuss Depo., Doc. 217-10 at 2). According to Fuss's deposition, he and Bensch subsequently discussed this offer over the phone.

> I just made him aware that I was putting the offer out there to sell, and I said, look, you don't have to do anything right now, but, **you know, whenever you sell the brewery, you need to square up on the intellectual properties**, and he said okay. We were both okay.

(Fuss Depo., Doc. 215 172:16–19 (emphasis added)). Bensch's recollection of the call differed sharply:

> I was surprised that Scott was reaching out and wanted to sell his original artworks, and then he's bringing up trying to sell the copyrights, which sounded kind of fishy to me because we had already bought those and paid for everything back in 1996. And now, after 20 years, he's bringing that up. And I was pretty confused by the inbound.

(Bensch Depo., Doc. 216 304:8–15).

Plaintiff's counsel also addressed  the Bensch Ownership Condition in a letter to defense counsel during the events leading up to this litigation: "Mr. Fuss developed and delivered copies of his work product to SweetWater in return for $500 and an understanding with Mr. Bensch that Mr. Fuss **would be**

29

**compensated more fully if/when SweetWater was sold.**" (January 2021 Hoots Letter, Ex. 14 to 3AC, Doc. 260-14 at 2 (emphasis added)).

Plaintiff's position is that "when Freddy Bensch ceased being an owner due to the Aphria merger . . . the Bensch Ownership Condition terminated [Sweetwater's] license rights in November 2020." (Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237 at 7). The Bensch Defendants, meanwhile, find the term in itself to be "uncorroborated," "fabricated," "nonsensical," and "too vague to be enforced." (Bensch Defs.' MSJ, Doc. 217-1 at 8, 10).

In short, both sides present sworn, completely contradictory testimony as to whether the license, from its inception in 1996, was conditioned on Bensch's ownership of the brewery. Given this inconsistency in the evidence presented, the Court has no choice but to find a factual dispute as to whether the license was conditioned on Bensch's ownership — a dispute that relies significantly on witness credibility, which would be an inappropriate factor for the Court to weigh at this phase. *See e.g., Allen-Sherrod v. Henry Cnty. Sch. Dist.*, 248 F. App'x 145, 147 (11th Cir. 2007) ("It is a hornbook principle that it is not proper for a district court to assess witness credibility when consider[ing] a motion for summary judgment as such determinations are reserved for the [factfinder]."). The Court's inability at this juncture to rule on the validity of this condition or whether the parties' actually agreed on this condition poses a substantial barrier to the Bensch Defendants' Motion for Summary Judgment regarding the infringement claims.

## 2. Recognition of Fuss as Copyright Owner

Plaintiff next alleges that the parties' license was conditioned on the promise that Sweetwater would "acknowledge" Fuss as owner of the Artwork's copyright. (Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237 at 10). The notion that a copyright owner shall be treated as such is implicit in the Copyright Act: "The owner of any particular exclusive right [comprised in a copyright] is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title." 17 U.S.C. § 201(d)(2). But the record evidence regarding this condition is thinner than the evidence related to the first condition.

Three key facts, however, remain the same. Again, in Plaintiff's telling, he "proposed that for the $500 already given [Sweetwater] could use [the Artwork] ***as long as*** (a) Bensch owned [the brewery] . . . and (b) [Sweetwater] acknowledged Fuss as the owner of the copyrights." (Pl.'s SMF, Doc. 237-64 ¶ 9). But Defendants' position is that "none of the founders discussed with Plaintiff any limits on [Sweetwater's] use rights for the artwork at any time prior to this lawsuit." (Bensch Defs.' SMF, Doc. 217-2 ¶ 26). Again, the direct factual contradiction in sworn testimony precludes summary judgment as to the scope of the license.

Despite their current position as to the license conditions, the Defendants have in the past repeatedly acknowledged that Fuss owns the copyright to the Artwork in the decades preceding this litigation. Specifically, although Bensch contended in his deposition testimony that he "bought the logo, and [] the fish tap handle and [] the fishing scene," (Bensch Depo, Doc. 216 16:8–10), numerous

31

documents indicate his knowledge otherwise. In 2002, when Fuss loaned Bensch the physical copies of the original artwork, Bensch signed a notarized agreement reading in part: "I, Frederick Bensch, acknowledge receipt of the following items **which are the copywritten materials and the property of Ray Scott Fuss and/or Scott Fuss** doing business as Petroglyph Studio." (2002 Agreement, Ex. 6 to Fuss Depo., Doc. 217-8 (emphasis added)). And in 2003, Bensch asked for — and Fuss agreed to — the transfer and assignment of all rights associated with the trout tap handle that the latter had designed for the company. (Pl.'s SMF, Doc. 237-64, ¶ 36; 2003 Assignment, Ex. X to Damages MSJ, Doc 210-26). Fuss does not dispute this assignment. The post-hoc assignment of the rights in the trout tap handle belies the notion that Bensch "bought" the Artwork and the tap handle, along with all associated rights, in 1996. In short, though Defendants dispute the existence of a contract term recognizing Fuss as the copyright owner of the Artwork, record evidence indicates that, until the events leading up to this litigation, they in fact did recognize as such.

Assuming arguendo that the license included a term recognizing Fuss as the copyright owner, Sweetwater's effort to register a duplicative, last-minute copyright of the Trout Banner would be an explicit breach of the license agreement. Sweetwater's belated registering of an ownership interest in the copyright of the Artwork in November 2020 effectively sought to formally repudiate Fuss's ownership interest. Fuss asserts that Defendants' recognition of him as the copyright owner was an express condition of the license from its inception. If the

Court found that to be true, the duplicative registration in November 2020 would be crucial evidence of Defendants' breach of that condition.

### 3. Ambiguity of Conditions

Seeking summary judgment despite the presence of factual disputes, the Bensch Defendants argue that, even if the conditions regarding (1) Bensch's ownership of the brewery and (2) Fuss's recognition as the copyright owner were legitimate, they would be unenforceably ambiguous. (Bensch Defs.' MSJ, Doc. 217-1 at 10–11, 11 n.2). As to the Bensch Ownership Condition, the Defendants contend that "Bensch was not '**the** owner' of SWB when Plaintiff says this condition was agreed upon" and "was not even the largest percentage owner at the time." (Bensch Defs.' MSJ, Doc. 217-1 at 12 (emphasis added)). Rather, "Bensch was only one of numerous owners of the brewery until 2012 when he divested all of his holdings in SWB companies." (*Id.* at 12). Thus, in the view of the Bensch Defendants, Plaintiff's condition that Bensch "own" the brewery is insufficiently specific and, indeed, was never fully satisfied — even at the time the license was conferred. Plaintiffs, conversely, argue that the law supports a broad view of "ownership" and that "Bensch qualified as an 'owner' of [Sweetwater] through the entire time period from 1996 to 2020 under the correct interpretation of that term." (Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237 at 22). The Bensch Defendants similarly contend that the second term — regarding recognition of Plaintiff as the copyright owner of the Artwork — is "vague and unenforceable" because "how one is 'treated' is not an

enforceable contract term and not sufficiently certain or definite to be enforced. (Bensch Defs.' MSJ, Doc. 217-1 at 11 n.2).

Defendants' contention that the two asserted conditions, regarding Bensch's ownership of the brewery and Fuss's recognition as copyright owner, are unenforceably uncertain, presents, in the first instance, a question of law. "Contracts, even when ambiguous, are to be construed by the court and no jury question is presented unless after application of applicable rules of construction an ambiguity remains." *Am. Cas. Co. v. Crain-Daly Volkswagen, Inc.*, 129 Ga. App. 576, 579 (Ga. Ct. App. 1973). Even a contract so uncertain as to be unenforceable may "later acquire precision and become enforceable" through the subsequent words, conduct, or acts of the parties. *Pine Valley Apartments Ltd. P'ship v. First State Bank*, 143 Ga. App. 242, 244–45 (Ga. Ct. App. 1977). "The parties' conduct constitutes, in effect, a rule of construction that may be applied by the court in resolving an ambiguity or by the jury where there is an issue of fact." Larkins, *Georgia Contracts* § 9:6 (citing *Eickhoff v. Eickhoff*, 263 Ga. 498 (Ga. 1993)*, overruled on other grounds by Lee v. Green Land Co., Inc.*, 272 Ga. 107 (2000); *Transkey, Inc. v. Adkinson*, 225 Ga. App. 457 (Ga. Ct. App. 1997)). In other cases, if a contract term is ambiguous and the parties' intent differed at the time of contract formation, "the meaning placed on the contract by one party and known to be thus understood by the other party at the time shall be held as the true meaning." O.C.G.A. § 13-2-4.

In short, Georgia law prescribes numerous tools of construction to allow courts to resolve contractual ambiguities. But the Court cannot, at this juncture, even conduct that analysis because of the pending factual dispute regarding *the terms of the agreement* — i.e., whether the controlling license between Fuss and Sweetwater was an oral agreement made in 1996 or an agreement implied by the course of conduct over the subsequent decades. The Bensch Defendants ask the Court to find two contractual terms unenforceably uncertain while fact issues remain about what, exactly, the contractual terms are. This argument is not ripe at this juncture.

### C. Termination of the License

Thus far, in examining the license between Plaintiff and Sweetwater, the Court has found a host of factual disputes — as to the creation, the scope, and the enforceability of any contract conditions. Similar factual disputes exist regarding the termination of the license. The parties maintain different theories as to the termination — and, in fact, terminability — of the license. In Defendants' view, "Plaintiff admits he granted [Sweetwater] an oral, non-exclusive license to use the artwork in exchange for $500 and free beer," and "the law is clear that the license was irrevocable, which bars most of his claims." (Bensch Defs.' MSJ, Doc. 217-1 at 4). This is because "[w]hen coupled with consideration, an implied non-exclusive license is irrevocable." (*Id.* at 5 (quoting *Lulirama Ltd., Inc. v. Axcess Broad. Servs. Inc.*, 128 F.3d 748, 757 (5th Cir. 1997)).

35

In Plaintiff's view, however, the license automatically terminated upon the consummation of the Aphria acquisition, by which Sweetwater "breached and effectively abandoned the license agreement under the agreement's own terms," i.e., the two conditions described above. (Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237 at 19). Plaintiff also contends that Bensch's and Sweetwater's "act of filing the false copyright registration asserting SweetWater's own copyright ownership on November 12, 2020 is so anathema to the central tenet of a nonexclusive copyright license that it is destructive to the license and even vitiates it," rendering it either void or voidable. (MSJ Hearing Tr., Doc. 268 46:21–25; Sweetwater Registration, Ex. 12 to Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237-13 at 2). Either way, Plaintiff asserts that the license terminated automatically when the Aphria transaction finalized in November 2020. In Plaintiff's view, the cease-and-desist notice sent by his counsel in May 2021 served as an extra safety mechanism to confirm and reiterate the termination of the license. (MSJ Hearing Tr., Doc. 268 47:1–13).

Both parties' positions have some legal merit. Numerous federal courts agree that consideration makes a copyright license irrevocable. *See Karlson v. Red Door Homes, LLC*, 18 F. Supp. 3d 1301, 1315–17 (N.D. Ala. 2014) (collecting cases). Importantly, "a license is a contract governed by ordinary principles of state contract law." *McCoy,* 67 F.3d at 920. In the context of land licenses, the Supreme Court of Georgia has indeed held that "a gratuitous license may be revoked at will, while a license for which consideration has been paid may not be revoked at will." *Young v. Beasley*, 271 Ga. 684, 684 (Ga. 1999) (footnotes omitted). Under Georgia

law, reliance is also material in the revocability of a license. *Brown v. Wood*, 124 Ga. App. 500, 501 (Ga. Ct. App. 1971) ("[E]ven a license becomes irrevocable when the licensee on the faith of the license expends money and erects valuable improvements necessary to enjoy the license.").

Regardless, law in the Eleventh Circuit and elsewhere also reflects the notion that a copyright license can become *revocable* (though not automatically revoked) if materially breached. In *Jacob Maxwell, Inc.*, the district court found — and the Eleventh Circuit affirmed — that a songwriter had given a minor league baseball team a non-exclusive, implied license to use his copyrighted work, requesting payment and recognition as the songwriter. The plaintiff there argued that the license "should be treated as having been cancelled in its entirety by the [defendant's] material breach of their oral understanding when it failed both to reimburse [his] costs and publicly to acknowledge [him] at games as the song's creator." *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir. 1997). The Eleventh Circuit disagreed, holding that "[s]uch a breach would do no more than *entitle* [plaintiff] to rescind the agreement and revoke its permission to play the song in the future." *Id.* (citing *Fosson v. Palace (Waterland), Ltd.,* 78 F.3d 1448, 1455 (9th Cir. 1996))[15] (emphasis in original); *see also HH Advert., Inc. v. Unique Vacations, Inc.*, 2025 WL 2027556, at *17 (S.D. Fla. July 21, 2025) ("If the parties

---

[15] "[O]nce a non-breaching party to an express copyright license obtains *and exercises* a right of rescission by virtue of a material breach of the agreement, any further distribution of the copyrighted material would constitute infringement." *Fosson v. Palace (Waterland), Ltd.,* 78 F.3d 1448, 1455 (9th Cir. 1996) (emphasis in original).

so intend, a license can be terminable at will after an agreed-upon term or after a certain event occurs." (citing *Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1294–95 (11th Cir. 1999))).

Under this regime, if indeed the Court were to find that Fuss's proposed conditions controlled, Sweetwater's potential violations — continuing to use the Artwork after filing a false copyright registration asserting it owned the Artwork, and after Bensch had divested completely from ownership — would make the license *voidable*, but not automatically void as of the consummation of the Aphria transaction. *See, e.g.*, *Marshall v. New Kids on the Block P'ship*, 780 F. Supp. 1005, 1009 (S.D.N.Y., Dec. 20, 1991) ("Case law in this Circuit indicates that a copyright licensee can make himself a 'stranger' to the licensor by using the copyrighted material in a manner that exceeds either the duration or the scope of the license."). Assuming that either of those conditions made the license *voidable*, the agreement would then be *void* and terminated as of the cease-and-desist notice sent by Plaintiff's counsel on May 19, 2021.

Having explained the appropriate framework under which to analyze the termination of Sweetwater's license, the Court returns to its oft-repeated refrain: factual issues abound. Without determining the scope of the license, for the reasons explained *supra* at 25–35, the Court cannot determine whether the Defendants materially breached the scope of the license, rendering it voidable. The factual disputes plaguing the license essentially preclude the Court from ruling on the Plaintiff's infringement claims at this juncture (Counts X, XI, XII, XIII), as

38

described below. The Court, thus, must also deny summary judgment as to Count VIII, regarding whether Plaintiff properly terminated the license.

## IV.    INFRINGEMENT CLAIMS

As detailed above, the Court has found significant and material factual disputes regarding the existence, scope, and termination of Defendants' license to use the Artwork. The Court will now address specifically how those findings bear on Plaintiff's claims of copyright infringement and Defendants' Motion for Summary Judgement as to those claims. Generally speaking, "[a] copyright owner waives his right to sue for copyright infringement while the nonexclusive license is in effect." *Wilchombe v. TeeVee Toons, Inc.,* 555 F.3d 949, 956 (11th Cir. 2009) (citing *Jacob Maxwell*, 110 F.3d at 753). But, "[a] defendant who exceeds the scope of an implied license commits copyright infringement." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010); *see also Hoeltzell v. Caldera Graphics*, 2012 WL 13012954, at *4 (S.D. Fla. June 11, 2012) ("Since a nonexclusive license does not transfer ownership of the copyright from the licensor to the licensee, the licensor can bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license.").

Plaintiff's direct copyright infringement claim (Count X), as articulated in the operative complaint, alleges that Sweetwater continued to distribute products and merchandise bearing the Artwork following Plaintiff's termination of the license. (3AC, Doc. 174 ¶¶ 327–340). Plaintiff also asserts numerous claims flowing from Defendants' alleged direct infringement conduct. Fuss alleges that Bensch,

personally, as well as Tilray, Four Twenty Corporation, and SW Brewing Company, LLC are vicariously liable for Sweetwater's allegedly infringing behavior (Counts XI, XII). Plaintiff also alleges that the Trustee Defendants are contributorily liable for the infringement (Count XIII). Defendants seek summary judgment on the direct copyright infringement claim (Count X) but note that "[w]ithout a direct or primary infringement, Plaintiff's vicarious and contributory infringement claims [also] fail as a matter of law." (Bensch Defs.' MSJ, Doc. 217-1 at 15). The Court examines these claims in turn.

### A. Copyright Infringement vs. Breach of Contract

A threshold question is whether Plaintiff's proper remedy, if infringement were found, would be in copyright or contract law.[16] As Judge Murphy wrote:

> The question of whether the breach of a contract licensing or assigning a copyright gives rise to a federal cause of action under the Copyright Act is a complex issue in a "murky" area. Under certain circumstances, when a licensee violates the terms of a nonexclusive license agreement, the licensor's only remedy against the licensee is in contract.

*Virtual Studios, Inc.*, 2014 WL 12495340, at *7 (quoting *Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926, 931 (2d Cir. 1992)); *see also Davis v. Tampa Bay Arena, Ltd.*, 2013 WL 3285278 (M.D. Fla. June 27, 2013). But,

> [t]he heart of the argument [] concerns whether the terms of the [non-exclusive license] are conditions of, or merely covenants to, the copyright license. . . . [I]f the terms of the [nonexclusive license] allegedly violated are both covenants and conditions, they may serve to limit the scope of the license and are governed by copyright law. If

---

[16] Plaintiff has alleged both copyright infringement under federal law and breach of contract under state law. (3AC, Doc. 174 ¶¶ 255–279, 320–345).

40

they are merely covenants, by contrast, they are governed by contract law.

*Virtual Studios, Inc.*, 2014 WL 12495340, at *7 (quoting *Jacobsen v. Katzer*, 535 F.3d 1373, 1380 (Fed. Cir. 2008)).

Two cases in this district are instructive. In *Virtual Studios*, the district court held that the one-year term of a copyright license was a condition, not a covenant, based on Eleventh Circuit and Second Circuit case law. *Id.* at *8–9. A second case adopted a similar distinction: if breach of a term would lead to further payment, it is a covenant; if it would lead to termination, it is a condition. *Microsoft Corp. v. Ebix, Inc.*, 2014 WL 12543889 (N.D. Ga. Feb. 14, 2014) (Pannell, J.). In *Microsoft*, the court was asked to categorize a provision that allowed the licensee to make copies of the licensed software, as long as it subsequently paid for them. Under another provision of the *Microsoft* contract, violations of the agreement could be cured within 30 days. *Id.* at *4. The court was "inclined to agree with [the licensee] that these provisions should be read as covenants to pay for licensed use of [licensor] products after the fact." *Id.* at *6; *see also Jacob Maxwell, Inc.*, 110 F.3d at 754 (holding failure to pay and provide recognition were not conditions precedent but could still entitle licensor to recover damages in state contract action); *Graham v. James*, 144 F.3d 229 (2d Cir. 1998) (holding non-payment of royalties pursuant to oral license was breach of covenant, not condition).

This line of cases suggests that Fuss's asserted terms, regarding Bensch's ownership and his own ownership recognition, are conditions, rather than covenants. Like the one-year term limit in *Virtual Studios*, and unlike the provision

41

in *Microsoft*, Fuss's proposed terms define the permissible scope of the license, rather than obligating further compensation.[17] Nevertheless, given the Court's previous conclusion that the conditions themselves cannot be adjudicated at this juncture without factual findings, the Court declines to definitively hold that the elusive terms of this agreement were intended to be conditions. Such a holding would require the Court to evaluate the parties' intent at the time of contracting, specifically to adjudicate whether the terms implied the possibility of terminating the license in the case of breach. Given the above-described factual disputes about the scope of the license, such a finding would be inappropriate herein.

### B. Derivative Liability

Summary judgment on Plaintiff's core infringement claim is impossible at this juncture for another reason: the parties leave completely unaddressed the issue of whether Defendant's refreshed logo is an improper derivative work, which would extend the possible infringement through the present day. A "derivative work" is one that is "based upon one or more preexisting works" but has been recast, transformed, or adapted." 17 U.S.C. § 101. "Such a work—if it is non-infringing and sufficiently original—qualifies for a separate copyright, although this copyright does not protect the preexisting material employed in the derivative work." *Montgomery v. Noga*, 168 F.3d 1282, 1290 (11th Cir. 1999) (citing 17 U.S.C.

---

[17] On the other hand, in *Jacob Maxwell Inc.*, the Eleventh Circuit found that the promise of "public recognition of authorship" was a covenant, not a condition precedent, because the plaintiff "did not make [it a] condition[] precedent to the permission he gave." 110 F.3d at 753–54. Again, however, this determination was based on the district court's ability to evaluate the terms themselves.

§ 103; *Stewart v. Abend,* 495 U.S. 207, 223–24 (1990)). "[P]rotection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully. . . . Thus, [derivative works] do not qualify for copyright protection if they are [] made without [the copyright holder's] authorization." *Latimer*, 601 F.3d at 1233–34 (quoting 17 U.S.C. § 103(a)).

As discussed *supra* at 18, in 2024, Sweetwater launched a rebrand campaign and released a new logo across its products. This more modern logo, like Fuss's original drawing, depicted a fish with a curved tail behind the word "Sweetwater." (3AC, Doc. 174 ¶ 166). Plaintiff thus amended his complaint to include an allegation of copyright infringement via an unauthorized derivative work:

> Starting in approximately April of 2024, Sweetwater Brewing Company, LLC and Sweetwater Colorado Brewing Company, LLC have also produced, reproduced and displayed the rebranded Sweetwater logo, which is an unauthorized derivative work of the Fuss Copyright in the Trout Banner artwork, without permission, license or proper authority from Plaintiff in violation of 17 U.S.C.S. § 106(2). These actions are further examples of direct copyright infringement on their part.

(*Id.* ¶ 340). Under this theory of the case, Sweetwater could be liable for direct copyright infringement (by its use of an unauthorized derivative) even if it had a valid license to Plaintiff's original artwork. That is because the "owner of copyright [] has the exclusive rights . . . to prepare [or authorize] derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). Given the absence of briefing by either party, however, the Court declines to analyze whether Sweetwater's rebranded logo constitutes an unauthorized derivative work. The Court's inability to adjudicate

one facet of Plaintiff's direct infringement claim on the current record — as well as properly evaluate the related vicarious liability issues — heightens the difficulty the Court faces in assessing these claims without a full evidentiary trial.

## C. Trustee Liability [Doc. 218]

One additional issue as to the infringement claims requires the Court's attention. Two Defendants — the Trustees of No Quarter Trust and the Trustee of Tortoise Trust (collectively, the "Trustee Defendants") — have moved for summary judgment as to the sole count against them, Count XIII (Contributory Infringement). Because of the additional elements of contributory infringement, it would be possible to adjudicate these claims without necessarily ruling as to the core copyright infringement. The Court thus examines the Trustees' Motion for Summary Judgment [Doc. 218].

### 1. Background on Trustee Defendants

Both No Quarter Trust and Tortoise Trust are Bensch family trusts.[18] No Quarter Trust was established by Freddy Bensch; Sharon Bensch serves as the Trustee, and is thus a named Defendant in this matter. (MSJ Hearing Tr., Doc. 268 97:14–17; Trustee Defs.' Reply ISO MSJ, Doc. 253 at 8). "The only beneficiaries of [No Quarter Trust] are [Freddy] Bensch's spouse, his descendants, and such charitable organizations as the Trustee may select." (Trustee Defs.' Reply ISO MSJ,

---

[18] As the Court understands it, George and Sharon Bensch are the parents of Frederick Bensch. (MSJ Hearing Tr., Doc. 268 84:17–18, 102:8–9).

Doc. 253 at 10). Freddy Bensch serves as the "protector" of No Quarter Trust, which allows him the power to replace a Trustee. (MSJ Hearing Tr., Doc. 268 98:7–16).

Tortoise Trust, meanwhile, was established by George Bensch. Its principal beneficiary is his spouse, and its additional beneficiaries are his descendants (including Freddy Bensch) and charitable organizations as occasionally chosen by the Trustee. (*Id.* 100:22–101:20). The Trustee of Tortoise Trust is Wood Duck, LLC, a corporate entity and named Defendant in this matter. (*Id.* 84:21–23).

At the time of the Aphria transaction, No Quarter Trust and Tortoise Trust collectively controlled a majority of the relevant stock in Sweetwater, meaning that the trusts' approval was necessary to sell that stock and, thus, close the merger and acquisition. (Pl.'s Resp. to Trustee Defs.' MSJ, Doc. 241 at 18; MSJ Hearing Tr., Doc. 268 111:15–21). Plaintiff argues that the Trustees' participation in the Aphria transaction — which, under Plaintiff's theory, terminated the license and started the clock on Sweetwater's infringement — constituted contributory infringement. (3AC, Doc. 174 ¶¶ 381–400; Pl.'s Resp. to Trustee Defs.' MSJ, Doc. 241 at 21–25).

The Eleventh Circuit "has stated the well-settled test for a contributory infringer as 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'" *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990). "The standard of knowledge is objective: 'Know, or have reason to know.'" *Id.*

It is axiomatic that a contributory infringement claim cannot survive unless it is underlied by a successful direct infringement claim. *Cable/Home Commc'n*

*Corp.*, 902 F.2d at 845. Thus, there are essentially three elements of a contributory infringement claim: (1) a finding of direct infringement; (2) the contributor's knowledge of the infringing activity; and (3) a finding that the contributor "induce[d], cause[d] or materially contribute[d] to" the infringement. As detailed *supra* at 22–42, the Court has found substantial and genuine disputes of material fact sufficient to preserve Plaintiff's direct liability claims at this stage. For similar reasons, the question of whether the Trustee Defendants "induce[d], cause[d] or materially contribute[d] to" any putative infringement raises questions of fact.[19]

Nevertheless, if the Plaintiff cannot, as a matter of law, establish knowledge, these two factual issues are irrelevant to the survival of the contributory infringement claim. Plaintiff's counsel has conceded that the Trustees had no independent knowledge of the infringing activity — that is, they would not have known about the scope or conditions of the license. (MSJ Hearing Tr., Doc. 268 131:19–132:9). However, Plaintiff contends that the Court should impute Bensch's knowledge of the license and its conditions onto the trusts, because they are so closely aligned. (3AC, Doc. 174 ¶¶ 381–400; Pl.'s Resp. to Trustee Defs.' MSJ, Doc. 241 at 24). The Trustee Defendants argue that Nevada law precludes imputing Bensch's knowledge onto the trusts. (Trustee Defs.' Reply ISO MSJ, Doc. 253 at 8,

---

[19] Parenthetically, the Trustee Defendants also argue that, as a matter of law, they cannot be held accountable for infringement which, under their view, did not begin until the termination letter in May 2021. (Trustee Defs.' MSJ, Doc. 218-1 at 8–10). Because the Trustees divested all interest in Sweetwater in the Aphria transaction in November 2020, they contend that they cannot be held responsible for conduct that entirely post-dated their involvement and ownership in the company. But this contention relies on a factual dispute the Court has already declined to rule on at this stage. *See supra* at 35–39.

13). Given the Plaintiff's concession regarding the Trustees' lack of independent knowledge, (MSJ Hearing Tr., Doc. 268 131:19–132:9), that argument, if true, would defeat the contributory infringement claim against the Trustees. The Court thus focuses its analysis on the issue of knowledge.

## 2. Trustee Knowledge

Trust administration is fundamentally a state law issue. Both trusts at issue, No Quarter Trust and Tortoise Trust, are Nevada trusts and the terms of both trusts require administration under Nevada law. (Trustee Defs.' Reply ISO MSJ, Doc. 253 at 6). Georgia and Nevada law agree that Nevada law should thus govern. Nev. Rev. Stat. § 164.045(1)(a) ("The laws of this State govern the validity and construction of a trust if [] [t]he trust instrument so provides[.]"); O.C.G.A. § 53-12-5 ("The meaning and effect of the trust provisions shall be determined by [t]he law of the jurisdiction designated in the trust instrument unless the effect of the designation is contrary to the public policy of the jurisdiction having the most significant relationship to the matter at issue."). The Court thus turns to the question of whether, as a matter of Nevada law, the Plaintiff can impute Bensch's knowledge onto the Trusts.

A trust is not an independent legal entity, but rather a fiduciary relationship legally represented by the trustee. *See* Restatement (Third) of Trusts § 2; *Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 383 (2016). Put otherwise, a trust "is not a natural person capable of taking action on its own behalf. The trustee is the person so empowered[.]" *Mathis v. County of Lyon*, 2014

47

WL 1413608, at *2 (D. Nev. Apr. 11, 2014) (interpreting Nevada law), *aff'd*, 591 F. App'x 635 (9th Cir. 2015). "A trustee has the powers provided in the trust instrument, expressed by law or granted by the court upon petition, as necessary or appropriate to accomplish a purpose of the trust." Nev. Rev. Stat. Ann. § 163.023. The trustee, thus, generally bears the responsibility of "invest[ing] and manag[ing] trust property as a prudent investor would." *Id.* § 164.745.

In other words, the default presumption is that the choices of the trust are dictated by the trustee. But Plaintiff alleges that "Bensch's knowledge of the vitiation of the Fuss License due to the failure of its conditions . . . and the concomitant infringement of the Fuss Copyrights, is chargeable to the Trustees." (Pl.'s Resp. to Trustee Defs.' MSJ, Doc. 241 at 23). Plaintiff advances, essentially, two theories as to why Bensch's knowledge should be imputed onto the Trustees. First, Plaintiff argues that, as a totality of the circumstances, Bensch had such a close, controlling relationship with the Trusts and Trustees that he effectively directed their decisionmaking. Second, Plaintiff underscores the fact that Chilly Water, LLC (Bensch's LLC) was appointed by the Trustees to act as their agent in connection with the Aphria transaction. (3AC, Doc. 174 ¶¶ 386–91).

Plaintiff's theory that Bensch's knowledge imputes directly upon the Trusts is clearer as to No Quarter Trust. Indeed, in sealed filings, Plaintiff points to numerous examples purporting to demonstrate Bensch's involvement with No Quarter Trust. (*See, e.g.*, Doc. 242-1 *SEALED*). Plaintiff also underscores Bensch's status as the grantor (AKA settlor) of No Quarter Trust. (Pl.'s Resp. to

48

Trustee Defs.' MSJ, Doc. 241 at 12). Bensch's relationship to Tortoise Trust is less robust: as a descendant of the settlor, he is admittedly one of the beneficiaries of the trust. (MSJ Hearing Tr., Doc. 268 101:5–12).

Under the plain text of Nevada law, "[a]bsent clear and convincing evidence, a settlor of an irrevocable trust shall not be deemed to be the alter ego of a trustee of an irrevocable trust." Nev. Stat. Rev. § 163.418. Moreover, Nevada strictly constrains what evidence may be evaluated. "[R]equests for the trustee to hold, purchase or sell any trust property" or the fact that the settlor has "executed [] documents related to the trust . . . in isolated incidents" is not "sufficient evidence for a court to find that the settlor controls or is the alter ego of a trustee." *Id.* Similarly, the fact that the "settlor [] holds unrestricted power to remove or replace a trustee" or is an "officer of a corporation" when "all or part of the trust property consists of an interest" in the corporation "must not be considered exercising improper dominion or control over a trust." *Id.* § 163.4177.

As the Trustee Defendants see it, Plaintiff has not made — or, even, approached — an evidentiary showing that Bensch had undue influence over the Trusts. That point is well-taken and supported by Nevada law.

But the fact that Bensch was not acting as an "alter ego" of the Trustees does not preclude the idea that Bensch, via Chilly Water, LLC, was acting as an agent for the Trusts. Most compelling as to Plaintiff's argument is the language in the Aphria Agreement designating Bensch as the Trusts' exclusive agent for all events related to or arising out of the Aphria transaction:

49

(a) Prior to entry into this Agreement, the Company and the Unitholders (other than the Blocker Members) shall appoint Chilly Water, LLC to act as the representative for the benefit of each Unitholder (other than the Blocker Members) as the exclusive agent and attorney-in-fact to act on behalf of each Unitholder (other than the Blocker Members), in connection with the transactions contemplated hereby.

(b) The Securityholders' Representative shall have the authority to act for and on behalf of the Unitholders (other than the Blocker Members)[.] . . . The Securityholders' Representative shall for all purposes be deemed the sole authorized agent of the Unitholders (other than the Blocker Members) from and after Closing until such time as the agency is terminated. . . . Notices or communications to or from the Securityholders' Representative shall constitute notice to or from each of the Unitholder (other than the Blocker Members) during the term of the agency. . . .

(d) A decision, act, consent or instruction of the Securityholders' Representative shall constitute a decision, act, consent or instruction of all of the Unitholders (other than the Blocker Members) and shall be final, binding and conclusive upon each such Person.

(Aphria M&A Agreement, Ex. 1 to 3AC, Doc. 261-1 at 65–66). Under Plaintiff's theory of the case, all of Bensch's knowledge at the time the Aphria transaction was finalized and closed was imputed onto the Trusts because his corporate entity Chilly Water, LLC, was acting as their "exclusive agent and attorney-in-fact . . . in connection with the transaction[]." *Id.*

An agent's knowledge is "imputed to the principal if knowledge of the fact is material to the agent's duties to the principal." Restatement (Third) Of Agency § 5.03 (2006); *see also United States v. Cooksey*, 275 F. 670, 674 (9th Cir. 1921), *aff'd* 262 U.S. 215 (1923) ("[N]otice to, or knowledge of, an agent, while acting within the scope of his authority and in reference to a matter over which his authority extends, is notice to or knowledge of the principal."). "The existence of

50

an agency relationship is generally a question of fact for the jury if the facts showing the existence of agency are disputed, or if conflicting inferences can be drawn from the facts." *Schlotfeldt v. Charter Hosp. of L.V.*, 112 Nev. 42, 47 (Nev. 1996). The scope of an agency relationship is also a factual question. *Pennymac Corp. v. Javalina Options Ltd.*, 135 Nev. 699 (Nev. 2019).

Applying that framework here, it would be reasonable to impute Chilly Water's (Bensch's) knowledge onto the Trustees and Trusts to the degree it was within the scope of the principal–agent relationship, i.e., "in connection with the [Aphria] transaction[]." (Aphria M&A Agreement, Ex. 1 to 3AC, Doc. 261-1 at 65– 66). Whether Bensch's knowledge relevant to potential infringement (knowledge of the asserted license conditions, knowledge of the license termination, and the filing of the duplicative copyright registration) falls within the scope of his role as the Trustees' agent in the Aphria transaction is a question of fact. Because questions of fact remain about the scope of Chilly Water's agent relationship with the Trusts, which determines the possibility of the Trustee's knowledge of infringement, summary judgment on the contributory infringement claim is inappropriate at this juncture.

## V.    ADDITIONAL CLAIMS

In addition to his intellectual property claims, Plaintiff also asserts a handful of state law business torts arising out of Defendants' pattern of conduct. First, Plaintiff asserts a claim for breach of fiduciary duty, alleging that Bensch and Sweetwater breached their fiduciary duty to him by failing to disclose to Aphria his

ownership of the Artwork; failing to negotiate with him for an assignment of the Artwork rights; and by obtaining a false copyright registration of his work. (3AC, Doc. 174 ¶¶ 224–25). The Bensch Defendants dispute the entire premise of the claim, alleging that, as a matter of law, the parties did not share a fiduciary relationship. (Bensch Defs.' MSJ, Doc. 217-1 at 25). Plaintiff also brings claims of fraud and fraudulent concealment, arising out of Bensch's alleged failure to disclose to Fuss Sweetwater's position that it owned the intellectual property rights to the Artwork, as well as the timeline of the Aphria transaction closing.

The analyses for all three state law claims rest on whether Plaintiff can establish that the Bensch Defendants had an obligation to disclose certain closely held information, as a result of either their business relationship or other contextual factors around their discussions. Though the conduct at issue across all three claims is largely the same, the different standards under Georgia law lead the Court to reach a split conclusion. The Court will grant summary judgment for the Defendants as to Plaintiff's breach of fiduciary duty claim (Count III), because Plaintiff has not established a disputed factual record from which the Court could find a fiduciary relationship. However, the Court will deny summary judgment as to Plaintiff's fraud and fraudulent concealment claims (Count I, II), because Plaintiff has established a factual dispute as to whether the particular circumstances surrounding his relationship with Bensch and Sweetwater gave rise to an obligation to share relevant information about the Aphria transaction.

52

### A. Breach of Fiduciary Duty (Count III)

"A plaintiff must prove three elements to establish a claim for breach of fiduciary duty: '(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach.'" *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 958–59 (11th Cir. 2009) (quoting *SunTrust Bank v. Merritt,* 272 Ga.App. 485 (Ga. Ct. App. 2005)). Fiduciary relationships are the exception, rather than the rule, among professional relationships.

> A fiduciary relationship arises only where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc. Business relationships are not ordinarily confidential relationships. . . . Examples of a confidential relationship in business include parties with a history of business dealings with each other or a relationship that is not arms-length, such as a partnership or principal and agent.

*Id.* at 959 (cleaned up). "A confidential relationship must be shown by proof and that burden of proof rests on the party claiming such a relationship exists." *Id.*

The Court does not find that the circumstances alleged, under Georgia law, create a genuine dispute of material fact as to whether a fiduciary relationship existed between Fuss, on the one hand, and Bensch and Sweetwater on the other. In support of a fiduciary relationship, Plaintiff points heavily to a pre-litigation communication from Defendants' counsel to Plaintiff's counsel noting, in part, that "[Fuss] enjoyed a relationship of trust and generosity with Sweetwater" and "enjoyed a decades-long special relationship with Sweetwater's founders that gave him perks and access not enjoyed by the general public." (Pl.'s Resp. to Bensch

Defs.' MSJ, Doc. 237 at 30 (quoting February 2021 Hyland Letter, Ex. 6, Doc. 237-7 at 2)). But "[t]he fact that parties . . . have trust and confidence in each other's integrity, does not automatically establish a confidential relationship." *Wilchombe*, 555 F.3d at 959. This fact alone, then, does not move the needle very far.

Plaintiff next argues that Bensch's position as the Sweetwater liaison for Aphria and the primary, long-time point of contact for Plaintiff made him "so situated as to exercise a controlling influence over [Fuss's] will, conduct, and interest." (Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237 at 30–31). Plaintiff alleges that "Bensch sat alone at the intersection of Fuss' copyright, knowledge of the Fuss license terms, and Aphria's interest in IP-related disclosures, reps and warranties." *Id.* And, indeed, the Court acknowledges the leverage that Defendants held over Plaintiff, in particular at the time of the Aphria transaction. But mere leverage does not establish the sort of partnership that gives rise to a fiduciary relationship.

Importantly, courts have found that a licensor and licensee do not typically form a fiduciary relationship without express circumstances to the contrary. For example, Judge Beverely Martin, when sitting in the Northern District of Georgia and applying Georgia law, held that a technology company licensing its intellectual property to an oil company did not share a fiduciary relationship with its licensee, citing the absence of any express agreement or joint business venture between the two parties. *Barney Holland Oil Co. v. FleetCor Techs., Inc.*, 2007 WL 9702207, at *9 (N.D. Ga. Aug. 17, 2007). Key to the court's finding was the fact that the two companies were "engaged in a transaction . . . in [an] effort to further their own

54

separate business objectives." *Id.* (quoting *Kienel v. Lanier*, 190 Ga. App. 201, 204 (Ga. Ct. App. 1989)); *see also Rossi v. Darden*, 2016 WL 11501449 (S.D. Fla. July 19, 2016) (finding, under Florida law, no fiduciary relationship between patent owner and licensor).[20]

In limited cases, Georgia courts have found possible confidential (fiduciary) relationships between buyers and sellers, sufficient to send the issue to a jury. *See Howard v. Barron*, 612 S.E.2d 569 (Ga. Ct. App. 2005). But in *Howard*, the court found a possible confidential relationship, appropriate for jury adjudication, only because of an "issue of fact regarding whether [the seller] exercised a controlling influence over the [buyers]." *Id.* at 573. As explained above, the mere commercial leverage Sweetwater held over Fuss does not constitute a controlling influence, given Plaintiff had distinct commercial interests from the Defendant.

In this instance, the Court does not see evidence put forth by Plaintiff to substantiate a fiduciary relationship between the parties. Plaintiff has not alleged that Defendants exercised a high degree of controlling influence, that they were engaged in a joint venture wherein loyalty was to be expected, or that there was any express agreement of a mutual fiduciary relationship. "Whether two parties have a fiduciary relationship is typically resolved by the trier of fact, but mere

---

[20] It is true that the Eleventh Circuit has found that, in cases of an exclusive copyright license, the licensor has a limited "fiduciary obligation not to allow its own copyright to be used to the detriment of its licensees." *Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc.*, 911 F.2d 1548, 1552 (11th Cir. 1990). That finding is not applicable here, however, both because the exclusive license in that case created a distinct mutual relationship and because the parties there had an express contractual agreement that the licensor would have the "sole right" to pursue infringement claims. *Id.*

allegations that a fiduciary relationship existed will not create a genuine issue for trial." *Barney Holland Oil Co.*, 2007 WL 9702207, at *8. Because, as a matter of law, the record evidence could not substantiate a fiduciary relationship, the Court finds no genuine dispute of material fact and will grant summary judgment to the Defendants as to Plaintiff's Breach of Fiduciary Duty claim (Count III).

### B. Fraud (Counts I, II)

Plaintiff next brings claims of fraud and fraudulent concealment. "Under Georgia law, '[t]he tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages.'" *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1296 (N.D. Ga. 2018) (Totenberg, J.) (quoting *ReMax N. Atlanta v. Clark*, 244 Ga. App. 890 (Ga. Ct. App. 2000)). In the context of fraudulent concealment claims like Plaintiff's here, "a plaintiff must prove the same five elements of a fraud claim," except that (1) "the scienter element requires that the alleged defrauder had actual, not merely constructive, knowledge of the fact concealed" and (2) "only the suppression of a material fact which a party is under an obligation to communicate can support such a claim." *Id.* (quoting O.C.G.A. § 23−2−53).

The Bensch Defendants primarily contest whether Bensch or Sweetwater was "under an obligation" to communicate certain information regarding their position on the Artwork ownership and the Aphria transaction. Specifically, Fuss alleges that Defendants failed to "advise Plaintiff that [Bensch] believed he already

owned the Fuss IP and that Plaintiff did not own it"; "that [Bensh] had no intention of including Plaintiff in the Aphria transaction or protect[ing] Plaintiff's interests in the Fuss IP"; "that the Closing would [] occur before December 2, 2020," when their call was scheduled; and that Sweetwater would file a duplicative, last-minute copyright application for the Artwork. (3AC, Doc. 174 ¶¶ 180–81, 189). Unlike his claim for breach of fiduciary duty, Plaintiff may sustain his fraud claims in one of two ways. "The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." O.C.G.A. § 23-2-53. The Court has already described above why a confidential or fiduciary relationship does not exist between the parties and thus turns to whether the requisite "particular circumstances" existed between the parties to support Plaintiff's fraud claims.

"The Georgia Supreme Court has set forth two factors necessary to establish such 'particular circumstances' for [fraud by concealment]: '(1) the intentional concealment of a fact (2) for the purpose of obtaining an advantage or a benefit.'" *Porter Pizza Box of Fla., Inc. v. Pratt Corrugated Holdings, Inc.*, 2018 WL 11447570, at *7 (N.D. Ga. Nov. 8, 2018) (Totenberg, J.) (quoting *Ga. Real Estate Com. v. Brown*, 152 Ga. App. 323, (Ga. Ct. App. 1979)) (holding "alleged intentional failure to disclose the sale of [] assets [] with the intent of reaping the benefits of [purchase agreement]" supported fraud claim "based on the 'particular circumstances' of this case even without 'confidential relations'"). Put another way, "the particular circumstances of the case may give rise to an obligation to

communicate where there is a concealment of 'intrinsic qualities of the article which the other party by the exercise of ordinary prudence and caution could not discover.'" *Amin*, 301 F. Supp. 3d at 1296 (quoting *McCabe v. Daimler AG*, 948 F.Supp.2d 1347, 1368 (N.D. Ga. 2013)).

Record evidence supports the possibility that Bensch's omissions in his communications with Fuss — including details about the Aphria deal and about Bensch's own plan to file a duplicative copyright application for the Artwork — were intentional and/or for his own benefit. For example, Fuss asserts that, after he reached out to Bensch on November 9, 2020, about the Aphria transaction, "Bensch sought to buy time by feigning the inability to find time to speak," presumably so that Sweetwater could obtain the necessary copyright registration and finalize the merger before their conversation. (Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237 at 14). This contention, if found to be true, would be probative of deceptive intent. But that conclusion would require a factual adjudication inappropriate at this juncture.

Most notably, Sweetwater and Bensch's midnight filing of the duplicative copyright application reflects intentional concealment for their own benefit. Sweetwater, apparently with Bensch's involvement, filed for this last-minute registration immediately after Fuss asserted his long-standing copyright ownership to Bensch and mere days before the Aphria acquisition closed. (Pl.'s SMF, Doc. 237-64 ¶ 69; Sweetwater Registration, Ex. 12 to Pl.'s Resp. to Bensch Defs.' MSJ, Doc. 237-13 at 2; Email Between Bensch & Thoren, Ex. 15 to Pl.'s Resp

58

to Bensch Defs.' MSJ, Doc. 237-16 at 2). As discussed *supra* at 10–12, Sweetwater made no disclosure of Fuss's ownership — or its own limited rights to the Artwork — to Aphria during the merger proceedings. The Defendants have provided no explanation regarding this belated registration, other than to reiterate their position that Sweetwater's license was irrevocable — which, regardless, would not entitle it to a copyright registration — and to imply that it was a possible "mistake." (MSJ Hearing Tr., Doc. 268 22:9–23:15). Certainly, the question of why Sweetwater proceeded to register Fuss's Artwork at the precise moment it did — the precise moment it was necessary for its financial windfall — raises serious factual issues relevant to the "particular circumstances" at issue in this case.

The record, at the very least, supports the possibility that Bensch and Sweetwater "concealed" from Fuss the "intrinsic qualities" of the Aphria acquisition — specifically details related to the closing of the transaction and the fact that Fuss's copyright ownership was not disclosed. *Amin*, 301 F. Supp. 3d at 1296. The Bensch Defendants contend that Fuss could have contacted Aphria himself, but chose not to. (Bensch Defs.' SMF, Doc. 217-2 ¶ 47). But it seems implausible to the Court that Fuss could have acquired details of the Aphria transaction "by the exercise of ordinary prudence and caution" and simply picked up the phone, given that he had nowhere been named as an interested party who owned crucial Sweetwater intellectual property. *Amin*, 301 F. Supp. 3d at 1296. These facts create the distinct possibility that the interactions between Sweetwater,

Bensch, and Fuss gave rise to those "particular circumstances" that would necessitate disclosure.

Defendants imply that "particular circumstances" giving rise to fraudulent concealment are rare, primarily arising in cases of "dependent relationships" or "extraordinary" cases. (Bensch Defs.' MSJ, Doc. 217-1 at 21). Those two examples proffered by Defendant are illustrative, but not definitive. In the first instance, fraudulent concealment claims can arise *either* "from the confidential relations of the parties or from the particular circumstances of the case." O.C.G.A. § 23-2-53. If the "particular circumstances of [a] case" required a dependent relationship, that category of fraudulent omission cases would be redundant of those arising out of confidential relationships. Because "particular circumstances" fraud claims are separate from those arising out of a fiduciary duty, they cannot, logically, be defined by the same type of closely held, dependent relationship.

Moreover, this Court has found viable fraudulent concealment claims in, for example, relationships with vendors — hardly the "extraordinary" circumstances Defendant sees as necessary. *See, e.g.*, *Porter Pizza Box of Fla., Inc.*, 2018 WL 11447570, at \*7; *Amin*, 301 F. Supp. 3d at 1296; *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 753563, at \*7 (N.D. Fla. Feb. 2, 2021) (applying Georgia law and finding, on summary judgment, "a triable issue of fact as to whether the 'particular circumstances' of this case warrant an imposition of a duty to disclose"). For these reasons, the Court finds a genuine dispute of material fact

60

as to whether this case's factual posture presents the sort of "particular circumstances" that would give rise to a fraudulent concealment claim here.

## VI.   DAMAGES [Doc. 210]

The Court thus turns to the final, and somewhat separate, Motion for Summary Judgment. The Defendants' third Motion [Doc. 210] seeks to establish a framework for calculating Plaintiff's actual damages, should he succeed on his direct infringement claim. Specifically, Defendants claim that the model used by Plaintiff's expert — a reasonable royalty calculation based on a hypothetical negotiation — is out-of-sync with both the value of Fuss's Artwork and the calculations courts typically apply in similar scenarios. Plaintiff argues such an analysis is inappropriate for summary judgment.

When copyright infringement is established, "the plaintiff may recover his 'actual damages and any additional profits of the infringer . . . that are attributable to the infringement[.]'" *Pronman v. Styles*, 645 F. App'x 870, 873 (11th Cir. 2016) (quoting 17 U.S.C. §§ 504(a)(1), (b)). Actual damages are usually "measured by the revenue that the plaintiff lost as a result of the infringement." *Id.* (quoting *Montgomery v. Noga,* 168 F.3d 1282, 1294–95 (11th Cir. 1999)) (cleaned up). "When, as in this case, the plaintiff cannot show lost sales, lost opportunities to license, or diminution in the value of the copyright, many circuits award actual damages based on the fair market value of a license covering the defendant's use." *Bitmanagement Software GmBH v. United States*, 124 F.4th 1368, 1374 (Fed. Cir. 2025). "To establish the fair market value, the plaintiff can either (1) show what

compensation he previously received for the infringed work or (2) show benchmark licenses, what licensors have paid for similar work." *Garden World Images Ltd. v. WilsonBrosGardens.com LLC.*, 2019 WL 8017802, at *3 (N.D. Ga. Oct. 31, 2019) (Totenberg, J.). "The value of this license should be calculated based on a hypothetical, arms-length negotiation between the parties," i.e., "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work." *Gaylord v. United States*, 678 F.3d 1339, 1343 (Fed. Cir. 2012); *see also Montgomery*, 168 F.3d at 1295.

Each party has submitted expert reports reflecting their proposed calculation of damages. Plaintiff's primary damages expert, Daniel Cenatempo, proposed two methodologies to estimate damages.[21] The first methodology measured "reasonable royalty" damages[22] to project the results of a hypothetical negotiation for the license, based on the factors laid out in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). The second methodology proposed a lump-sum fixed-fee license, which Cenatempo framed as a prepayment of running royalties. Both resulting calculations resulted in damages of many millions. In rebuttal, Defendants' damages expert Abel Teshome contended that Cenatempo's analyses were fundamentally flawed because they "necessarily [led] back to a running royalty" calculation, and further disputed several of Cenatempo's

---

[21] Cenatempo's full report is available under seal only. (*See* Expert Report of Daniel J. Cenatempo ("Cenatempo Report"), Doc. 211-1 *SEALED*).

[22] "Reasonable royalties" are defined as the royalties customarily paid for the type of use to which the defendant has put the infringing material.

accounting calculation decisions.[23] Each party also enlisted experts on graphic design — Robert Wallace for Plaintiff and Ellen Shapiro for Defendants. Shapiro, in part, opined on the typical fee structure in the graphic design industry. (Damages MSJ, Doc. 210-1 at 21).

At bottom, Defendants ask the Court to reject the running royalty model as a damages calculation methodology because, in their view, "there is no evidence in the record to support a royalty tied to sales or company performance." (Damages MSJ, Doc. 210-1 at 17). Specifically, Defendants assert that a royalties model should be a non-starter for the Court because (1) "[a]ll of Fuss's historical invoices and agreements in the record evidence a business practice of charging a one-time, fixed fee for his services" and (2) "graphic design is a fee-based industry." (*Id.* at 19, 21). Defendants contend that "[t]he evidence does not support the inferential leap that Cenatempo made to arrive at his inflated actual damages amount," i.e., his use of a running royalty model. (*Id.* at 10, 18). As discussed above, Defendants also provide their own experts to detail their conceptual and mathematical qualms with Cenatempo's calculation. (*Id.* at 21). Plaintiff argues summary judgment is inappropriate here because it asks "this Court to resolve factual disputes regarding the application of the *Georgia-Pacific* factors, the relative weight of various factors, and to assess the credibility of competing economic narratives." (Pl.'s Resp. to Damages MSJ, Doc. 232 at 10).

---

[23] Teshome's full report is available under seal only. (*See* Expert Report of Abel Teshome ("Teshome Report"), Doc. 207-3 *SEALED*).

Conflicting expert testimony generally precludes summary judgment. *See, e.g., Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*, 99 Fed. Appx. 911, 921 (Fed. Cir. 2004) (summary judgment improper in patent context given "battle of the experts"); *Scripps Clinic & Rsch. Found.*, 927 F.3d 1565, 1578 (Fed. Cir. 1991) ("Trial by document is an inadequate substitute for trial with witnesses, who are subject to examination and cross-examination in the presence of the decision-maker."). "In the face of conflicting expert testimony, it is the province of the [fact-finder] to decide which expert, if either, to credit." *Outback Steakhouse of Fla., LLC v. 137 Acres, LLC*, 2022 WL 4596677, at *7 (N.D. Ga. June 24, 2022) (Story, J.) (quoting *Fireman's Fund Ins. Co. v. Holder Constr. Grp., LLC*, 362 Ga. App. 367, 373 (Ga. Ct. App. 2022)); *see also EPL, Inc. v. USA Fed. Credit Union*, 173 F.3d 1356 (11th Cir. 1999) (holding "jury should hear evidence" in copyright case "and decide between the differing methods of analyses of the parties' experts as well as their conflicting conclusions").

The Defendants' summary judgment motion as to Plaintiff's damages calculation ultimately asks the Court to assess Cenatempo's credibility and accuracy — quintessentially factual questions — at a stage of the proceeding where such factual adjudication is verboten. The case law in this Circuit agrees. *See, e.g., Telecomm. Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.*, 66 F. Supp. 2d 1306, 1320 (N.D. Ga. 1998) (holding "conflicting testimony of [] experts presents genuine issues of material fact that must be resolved by a jury" where defendant contended that plaintiff's expert testimony was "insufficient to support plaintiffs'

theory of recovery" and had "presented expert testimony of its own that reaches a conclusion directly contrary to that of plaintiffs' expert"); *United Food & Com. Workers Unions & Emps. Pension Fund v. Mercer Hum. Res. Consulting, Inc.*, 2008 WL 11406166, at *4 (N.D. Ga. Apr. 4, 2008) (where defendant argued damages claim was overly speculative, denying summary judgment because of material factual disputes regarding "[d]efendant's valuation methods and assumptions, as well as the amount of damages"); *ITT Corp. v. Xylem Grp., LLC*, 963 F. Supp. 2d 1309 (N.D. Ga. 2013) (denying summary judgment on actual damages where plaintiff claimed royalty rate was "too speculative" and "based only on a hypothetical royalty rate that cannot be verified based on an established, historical royalty rate").

In response to the Court's concerns, Defendants addressed this issue in some depth at the hearing on their pending Motions:

> There is absolutely no industry evidence that for a graphic logo anyone charges a reasonable royalty times products, and there is absolutely no evidence in the record that Fuss charges that way or that Sweetwater pays that way. And so that makes it beyond the pale of competing experts. That makes it fundamentally and completely devoid of a factual basis. That is why it is appropriate to do it now and not wait until trial. . . . I think the fundamental underpinnings are so off that it doesn't deserve to see the light of day in trial.

(MSJ Hearing Tr., Doc. 268 148:9–18, 149:22–23). But that argument would make a circular proceeding of summary judgment motions. Essentially, Defendants contend that, while courts generally may not make factual or credibility determinations on summary judgment, in this specific case, the proffered expert evidence is so unfactual and so uncredible, that the Court should dismiss it as

65

completely unreliable. But the Defendants' legal and expert critiques of Cenatempo's expert report ultimately do not eliminate a genuine dispute of material fact as to how damages should be calculated. Rather, they underscore it.

In support of their summary judgment motion and critiques of Plaintiff's damages framework, Defendants rely significantly on *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004), and *Oracle Corp. v. SAP AG*, 765 F.3d 1081 (9th Cir. 2014). (*See, e.g.*, Damages MSJ, Doc. 210-1 at 17–21; MSJ Hearing Tr., Doc. 268 138:4–149:25). In *Polar Bear*, where a movie company sued a watchmaker for improperly using its footage, the Ninth Circuit upheld a $315,000 jury award on actual damages based on a lost license fee calculation, but set aside the $2.1 million award for indirect profits because plaintiff "failed to demonstrate a nonspeculative causal link" for part of those profits and because "the jury did not delineate the individual components of its total indirect profits award." 384 F.3d at 708–16. Similarly, in *Oracle*, the Ninth Circuit approved of the district court's decision to remit a $1.3 billion jury verdict, holding that "the jury awarded damages using an undue amount of speculation" given plaintiff Oracle's failure to provide "the range of the reasonable market value for the hypothetical license in question." 765 F.3d at 1089 (quoting *Polar Bear Prods.*, 384 F.3d at 709) (cleaned up). The appellate court specifically pointed out that, "because Oracle has no history of granting similar licenses, and has not presented evidence of 'benchmark' licenses in the industry approximating the hypothetical license in question here, Oracle faced an uphill battle." *Id.* at 1093. As defense counsel pointed out at oral

argument, these cases underscore that, even in lost license fee and hypothetical negotiation scenarios, damages cannot be unduly speculative. (MSJ Hearing Tr., Doc. 268 138:4–148:23). In Defendants' view, then, these cases would counsel the Court to reject Plaintiff's damages framework because he lacks sufficient evidence to support use of a running royalty calculation.

Importantly, however, the appellate decisions in both *Oracle* and *Polar Bear* came after jury trials. In other words, by asking the Court to evaluate at this juncture whether Plaintiff's damages framework is unduly speculative, the Defendants seek relief that *Oracle* and *Polar Bear* neither address nor advise. And, notably, in *Polar Bear*, the Ninth Circuit rejected the jury's indirect profits figure based on a factual issue — specifically, whether the plaintiff had provided sufficient evidence for the jury to find defendant's profits attributable to a particular instance of infringing use. This analysis only underscores the factual nature of this question.

Moreover, Defendants' critique of Cenatempo's calculation is not merely that it is "speculative," as was the crux of the issue in both *Polar Bear* and *Oracle*. Rather, Defendants argue that his "fundamental underpinnings are so off that it doesn't deserve to see the light of day in trial," i.e., that Cenatempo's entire use of a running royalty framework — not merely the lack of evidence to support it — is problematic. (MSJ Hearing Tr., Doc. 268 149:14–25). This is fundamentally an issue of credibility. As the Court has made clear, credibility determinations are inappropriate herein. *See Allen-Sherrod v. Henry Cnty. Sch. Dist.*, 248 F. App'x 145, 147 (11th Cir. 2007) ("It is a hornbook principle that it is not proper for a

district court to assess witness credibility when consider[ing] a motion for summary judgment as such determinations are reserved for the [factfinder].").

Along similar lines, Defendants' summary judgment motion as to the damages framework is untenable because it asks the Court to make *Daubert*-like findings regarding Cenatempo's methodology without providing any of the information critical to *Daubert* motions. "[T]he Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). But the Defendants make clear that is not their request here and, indeed, that they "reserve the right to challenge Cenatempo's analysis under the *Georgia Pacific* factors and the amounts identified during the *Daubert* process." (Damages MSJ, Doc. 210-1 at 10–11 n.5). Rather, Defendants ask the Court to cast aside Plaintiff's primary damages expert and substitute the Court's own assessment of factual correctness. This request goes further than even *Daubert* would allow for. *See Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 2009 WL 856306, at *6 (N.D. Ga. Feb. 9, 2009) (Carnes, J.) (holding that "a battle of the experts that must be resolved by a jury" because "*Daubert* does not permit the Court to 'evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies'"(quoting *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003))).

In sum, the Court finds that the parties' dueling expert testimony as to the calculation of infringement damages precludes summary judgment at this juncture

given the required — and, at this stage, inappropriate — credibility determinations required in such an adjudication. Defendants also moved for summary judgment as to the calculation of damages on Plaintiff's fraud and breach of fiduciary duty claims, arguing that those damages "like the alleged copyright infringement [damages]" are essentially equal "to the fair market value of the Logo Art." (Damages MSJ, Doc. 210-1 at 22).  To the degree the Motion relates to the breach of fiduciary duty claim, it is moot. *See supra* at 53–56. Otherwise, the remaining damages calculations rely on the calculation of infringement damages. It is thus impossible to grant summary judgment on the issue of fraud damages given the inability to determine an infringement damages framework at this juncture. Summary judgment is thus inappropriate for the Motion writ large.

## VII.  CONCLUSION

The facts make the law. Nowhere is this more true than in this proceeding, in which the parties give, at times, entirely divergent factual accounts. The significant disputes of fact and questions of credibility woven throughout this matter run contrary to the grant of summary judgment, except as to the specific claims referenced below. Given the parties' decision to proceed with a bench trial, it is highly possible that this Court will sit as the ultimate factfinder in a mere few months. But that is not the Court's role right now.

For the reasons above, the Court **DENIES IN FULL** Defendants' Motion for Summary Judgment on Plaintiff's Actual Damages Theory [Doc. 210]. The Court **GRANTS IN PART** the Bensch Defendants' Motion for Partial Summary

Judgment [Doc. 217], as to the Defendants' breach of fiduciary duty claim (Count III). The Court otherwise **DENIES** that Motion as well. The Court **DENIES IN FULL** the Trustee Defendants' Motion for Summary Judgment [Doc. 218].

Trial in this matter is scheduled to begin on Thursday, August 13, 2026. The Court is aware of the parties' mediation efforts, which the parties previously indicated may resume following issuance of the Court's decision on summary judgment. The Court encourages the parties to resume their mediation. To the degree helpful, the parties are welcome to request a teleconference with the Court to discuss the status of mediation.

Given the upcoming trial, the Court sets the following deadlines. The parties shall report to the Court the results of their mediation **by June 1, 2026**. In the event mediation does not succeed, the parties should submit their consolidated pretrial order **by July 8, 2026**, and the Court will conduct a pretrial conference on **July 23, 2026**. Trial will commence on **August 13, 2026.**

**IT IS SO ORDERED** this 19th day of March, 2026.

_____
**Honorable Amy Totenberg**
**United States District Judge**

70